COUNTY COURT, PITKIN COUNTY, STATE OF COLORADO
Case No. 2015M197

---

TRANSCRIPT OF PLEA/SENTENCING HEARING

---

PEOPLE OF THE STATE OF COLORADO,

Plaintiff,

v.

NIKOS HECHT,

Defendant.

---

The above-entitled matter came on for hearing before the Honorable Erin Fernandez-Ely, Judge of the Ninth Judicial District, on February 24, 2016, Aspen, Colorado.

---

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Ms. Sherry Caloia, Esq. District Attorney |
| For the Respondent: | Ms. Pamela Mackey, Esq. |
| For the Victim: | Mr. David Bovino, Esq. |

(The Defendant, Nikos Hecht, was present in person.)

1          **WEDNESDAY, FEBRUARY 24, 2016**

2          THE COURT:  Case number 15M197, State of

3    Colorado v. Nikos Hecht.  The parties are present.  The

4    District Attorney appears in person, Sherry Caloia and Ms.

5    Mackey appears with Mr. Hecht.

6          I've been given a copy of a motion to amend

7    information, which I think means complaint in Count Court.

8    I don't think I have informations in County Court so I

9    will take it to mean amended complaint adding Count 4,

10   harassment, strike, shove or kick, a Class 3 misdemeanor

11   and then the guilty plea to that charge signed by Pamela

12   Mackey and by Mr. Hecht and it's dated today.  Okay.

13         So let me ask, Ms. Caloia, other than to tender

14   this plea, is there anything else you would like to say?

15         MS. CALOIA:  No, Judge, we have negotiated this

16   plea.  It has been given to the victim, Ms. Warfel, in

17   this case and I do believe that she is not happy with it.

18   We are going forward with it, in any event, because we

19   think it is the appropriate plea in this case and is very

20   consistent with most misdemeanor domestic violence

21   incidents that we handle for first time.

22         THE COURT:  Okay and do you have a copy of Ms.

23   Warfel's statement that -- she sent a statement in by fax,

24   I believe -- is that right -- this morning at 9:33 a.m.

25   and I have two copies, one for each of you.

1          MS. CALOIA:  Thank you.

2          THE CLERK:  Judge, it was hand-delivered by a

3 legal assistant.

4          THE COURT:  It was hand-delivered -- excuse me,

5 hand-delivered -- one for her is there as well.

6          And Mr. Bovino is present.  Correct?

7          MR. BOVINO:  That's correct.

8          THE COURT:  Okay and usually the process

9 involves the District Attorney telling what the plea is.

10 The plea is to harassment, a Class 3 misdemeanor and act

11 of domestic violence and I go through that plea with the

12 Defendant to determine whether or not it's voluntary and

13 whether or not it's just.  I ask the factual basis

14 usually, although in County Court it's not required unless

15 it's a Class 1 misdemeanor, I do usually say what

16 happened, at the very least, so that I understand whether

17 or not it is a just plea.

18          MS. CALOIA:  There's a statement of the --

19          THE COURT:  -- of that in there and the factual

20 basis, and of course, I have all of the arrest warrant

21 information --

22          MS. CALOIA:  -- yes --

23          THE COURT:  -- and cases -- lots of information.

1          MS. MACKEY:  Paragraph 15 of the request to

2  plead guilty, Your Honor, is an agreed upon factual basis

3  for the plea.

4          MS. CALOIA:  It is actually Mr. Hecht's

5  statement as to the factual basis.

6          THE COURT:  All right.

7          MS. CALOIA:  I would like to add to that if I

8  could.

9          THE COURT:  Okay.

10          MS. CALOIA:  Mr. Hecht was charged with third

11  degree assault, harassment being phone calls, and

12  menacing, I believe.  I do not believe we could prove the

13  third degree assault beyond a reasonable doubt in this

14  case and I do believe that harassment, strike, shove, kick

15  is the appropriate charge and is based on the factual

16  basis outlined by Mr. Hecht in his plea.  There were a

17  number of phone calls made by Mr. Hecht to Ms. Warfel.  We

18  are dismissing that plea, however -- or that count of

19  harassment, Class 3 misdemeanor, for his plea of guilty to

20  harassment, strikes, kicks, shoves.  There was also some

21  menacing that did occur in the form of Mr. Hecht's verbal

22  statements to Ms. Warfel that were of a threatening

23  nature, not very pleasant and that also is being dismissed

24  for this plea to harassment misdemeanor today.

1          THE COURT:  Okay and to refresh my recollection,

2    so the phone calls are being dismissed but there were 113

3    or something like that.

4          MS. CALOIA:  There were quite a bit -- quite a

5    number of phone calls, yes.

6          THE COURT:  Okay.  All right.  I would like to

7    know if Mr. Bovino intends to speak on behalf of Ms.

8    Warfel or not.  And you don't need to speak now.  You can

9    listen and then participate in the sentencing part of the

10   case.

11         MR. BOVINO:  Sure.

12         THE COURT:  As opposed to the plea so it's up to

13   you.  Okay.  All right.  I do want to go over this letter

14   though and it is quite telling even though she called me

15   Judge Rodriguez-Ely instead of Judge Fernandez-Ely, it is

16   eloquent and it is articulate and it does, I think,

17   address the issue of domestic violence pretty accurately.

18   I'm going to read some of it but before I do that, I do

19   want to read this domestic violence factual basis which I

20   think is clear was drafted by the Defendant --

21         MS. CALOIA:  -- yes --

22         THE COURT:  -- not by the People.  All right.

23   So --

24         MS. MACKEY:  -- may I have just a moment please?

25         THE COURT:  Yes.

1          MS. CALOIA:  Judge, the -- the third degree

2    assault that I said we were dismissing was based on an

3    allegation of pushing her head into the concrete or the

4    floor.  I can't prove that beyond a reasonable doubt and

5    so it's not being used as a factual basis at all.  The

6    thing that I could prove is what Mr. Hecht put in his

7    statement about the facts that evening.  He grabbed her

8    purse.  There was a bruise on her arm and it was domestic

9    violence because they were in an intimate relationship.  I

10   do agree with the Defense in that regard.

11         The other two charges are being dismissed in

12   light of this plea.  I'm sure that we disagree about them

13   but they are being dismissed in light of this plea and so

14   I just want to make that clear to the Court and Ms. Mackey

15   might have some statements about that.

16         MS. MACKEY:  Yes, Your Honor.  The request that

17   came from the Office of the District Attorney was that Mr.

18   Hecht plead guilty to a Class 3 misdemeanor, specifically

19   harassment, based on the fourth part of that statute,

20   which is other physical contact, the shorthand to strike,

21   shove, kick but there's also the fourth element, which is

22   other physical contact and the suggestion of the District

23   -- the Office of the District Attorney -- the request was

24   made to plead guilty to that based upon the grabbing of

25   the purse and the strap hurting -- according to Ms.

1    Warfel, hurting her -- her arm and so it was just

2    beginning to sound like to me that we had made this up out

3    of whole cloth.  This was a negotiated factual basis.  It

4    began with the suggestion of the District Attorney's

5    Office and we ultimately negotiated this language.

6            THE COURT:  Okay.  All right.  Let me just go

7    through then first seeing if the plea is voluntary and as

8    I understand it there are no sentencing concessions.  Is

9    that right?

10           MS. CALOIA:  That's correct.

11           THE COURT:  All right.  Thank you.

12           MS. MACKEY:  Yeah, it's our understanding that

13   the Prosecution will not be asking for any jail but there

14   are no official sentencing concessions.

15           MS. CALOIA:  That's correct.

16           THE COURT:  All right.

17           MS. CALOIA:  That's correct.

18           THE COURT:  Thank you.  Mr. Hecht, I have here a

19   guilty plea and waiver of rights indicating that today you

20   intend to plead guilty to harassment, a Class 3

21   misdemeanor.  Is that correct?

22           THE DEFENDANT:  That's right.

23           THE COURT:  And that you intend also to plead to

24   domestic violence.

25           THE DEFENDANT:  Right.

1    THE COURT:  Okay.  Do you understand that by so

2  pleading you're waiving your right to challenge the

3  charges?  You're waiving your right to a jury trial where

4  the State would have to prove the charges against you

5  beyond a reasonable doubt.  Do you understand that?

6    THE DEFENDANT:  I do.

7    THE COURT:  Do you -- and have you consulted

8  with your attorney about this plea?

9    THE DEFENDANT:  I have.

10    THE COURT:  And are you happy with the services

11  of your attorney?

12    THE DEFENDANT:  Yes.

13    THE COURT:  Okay.  Do you also understand that

14  by pleading guilty you're waiving your right to remain

15  silent at sentencing?

16    THE DEFENDANT:  I -- I --

17    THE COURT:  -- I get to ask you questions --

18    THE DEFENDANT:  -- okay --

19    THE COURT:  -- and that you should answer them

20  truthfully, if you can, and that if you don't, I might

21  hold it against you.  Those kinds of things need to be

22  pretty clear.  All right.

23    And do you understand that the factual basis of

24  this plea is stipulated in this document to include that

25  -- not to include but to specifically say that you

1  subjected Ms. Warfel to physical contact, specifically --

2  do you want to go ahead and read the rest of that for me?

3          MS. MACKEY:  Just read it aloud.

4          THE DEFENDANT:  I grabbed her purse and she was

5  attempting to leave my home and doing -- and in so doing I

6  may have caused the strap of her purse to bruise her arm.

7  I believed that the purse contained my property including

8  several wristwatches and pieces of jewelry.

9          THE COURT:  Okay.  So the plea requires -- the

10  charge requires that you did so with an intent to alarm or

11  annoy Ms. Warfel.  Is that your --

12          THE DEFENDANT:  -- that's right --

13          THE COURT:  -- understanding as well?

14          THE DEFENDANT:  That's correct.

15          THE COURT:  Okay and as far as it being an act

16  of domestic violence, what is your understanding with

17  respect to that?

18          THE DEFENDANT:  You want me to define domestic

19  violence or --

20          THE COURT:  -- yeah, in your words.  You're

21  pleading guilty to an act of domestic violence and what I

22  want to know is what you think you did that causes you to

23  plead guilty today.

24          THE DEFENDANT:  I think that it's an escalation

25  of conflict that is much better served to -- to ratchet

1   back and to -- to not continue to escalate something that

2   turns out to be painful for somebody and things get broken

3   and it's a silly situation to have happened and I'm sorry

4   for it.

5        THE COURT:  All right.  Are you now under the

6   influence of alcohol or drugs that would impair your

7   ability to make this plea?

8        THE DEFENDANT:  No.

9        THE COURT:  Let me ask you this, and listen very

10   carefully.  An act of domestic violence in the statute is

11   a -- is defined as an act or threatened act of violence

12   upon a person with whom you have been involved in an

13   intimate relationship.  Would you agree?

14        THE DEFENDANT:  I agree with that.

15        THE COURT:  Okay.  It also includes any other

16   crime against a person or against property when used as a

17   method of coercion, control, punishment, intimidation or

18   revenge directed against that person with whom you have an

19   intimate relationship.  Would you agree that that --

20        THE DEFENDANT:  -- I agree with that.

21        THE COURT:  That is something that you are

22   accountable for.

23        THE DEFENDANT:  I've given a lot of thought to

24   it and I feel I am.

1          THE COURT:  Okay.  Good.  So you're here trying

2    to be accountable --

3          THE DEFENDANT:  -- I am --

4          THE COURT:  -- for your acts of domestic

5    violence.

6          THE DEFENDANT:  I am.

7          THE COURT:  And finally, do you understand that

8    you can receive up to six months in the county jail and/or

9    $750 fine?  She's going to recommend no jail, but I'm not

10   bound by that.

11         THE DEFENDANT:  I understand.

12         THE COURT:  Do you also understand that it is

13   required that you undergo a treatment evaluation --

14   domestic violence evaluation and complete that treatment

15   as recommended?

16         THE DEFENDANT:  I'm willing to do that.

17         THE COURT:  All right.  The Court accepts the

18   plea as voluntary.  With respect to whether or not it's

19   just or not, is this when you would like to be heard, Mr.

20   Bovino, or would you like to be heard at sentencing?

21   Because if I accept the plea, here's what usually happens,

22   I immediately go to sentencing.  Every now and then --

23   every now and then, I think a presentence investigation is

24   authorized -- not very often in County Court.  It's

25   something they always do in District Court.  Sometimes I

1    ask for a treatment evaluation first before I go through

2    sentencing and sometimes I also request case management,

3    Mind Springs Health's report and I don't see Roger here

4    but Roger Adams of Mind Springs Health has reported -- did

5    he send you anything -- that he intended to be here and

6    that there was a positive test and do you know that, Ms.

7    Mackey?

8            MS. MACKEY:  I do.

9            THE COURT:  Okay.

10           MS. MACKEY:  And I talked to Roger about it.  We

11   -- we can explain that to the Court.

12           THE COURT:  Okay and that there was also an

13   evaluation in that venue that was not completed.  Is that

14   your understanding as well?  When you have case management

15   here, we have determined that -- of course, is the client

16   isn't willing, then we go back to the drawing board about

17   what bond is and bond conditions but if they consent to

18   the Mind Springs Health case management and are thereby

19   released, they're also agreeing that they'll have

20   evaluation of their drug and alcohol issues.

21           MS. MACKEY:  I've been in regular contact with

22   Mr. Adams --

23           THE COURT:  -- and nobody's asked --

24           MS. MACKEY:  -- he's never said anything to me

25   about it.

1        THE COURT:  Okay, so has he asked Mr. Hecht

2  about it?

3        THE DEFENDANT:  I didn't understand that that's

4  what he was asking for and I went in twice to go -- to

5  ascertain what I was supposed to do and he never -- no one

6  was ever in at the time that I went there.

7        THE COURT:  Okay.  All right.  So we'll get into

8  that in a minute but you can explain --

9        MS. MACKEY:  -- sure we certainly would have

10  fixed it and he never mentioned anything to me and I've

11  talked to him many times over the last few months.

12        THE COURT:  Okay.  All right.  Thank you.

13        Mr. Bovino.

14        MR. BOVINO:  I --

15        THE COURT:  -- and you need to come up to the

16  podium so that we can hear you and identify yourself

17  please.

18        MR. BOVINO:  Hello, Your Honor, my name is David

19  Bovino.  I'm counsel for the victim, Brooke Warfel.  We do

20  not believe that this is a just plea for some of the

21  reasons outlined in the victim's letter to Your Honor.  I

22  would like to state a few of them to the Court and then

23  I'd request permission to approach the bench to discuss

24  some sensitive information that the victim doesn't want

25  necessarily in the court domain.

1          As the Court is aware, the victim did call 911

2     before the violence escalated.  Mr. Hecht answered the 911

3     phone call and apparently lied to law enforcement about

4     why the call was made.  The victim was held hostage at the

5     Hecht residence for more than 12 hours without an ability

6     to leave the residence.  The victim's life was threatened

7     on multiple occasions as were her friends and her family.

8     The property that was destroyed at the residence belonged

9     to the victim, not to Mr. Hecht.

10          Mr. Hecht claims that he views the situation

11     that happened as a silly situation.  The victim doesn't

12     believe there was anything silly about this situation.  In

13     the aftermath of the arrest, the victim was threatened by

14     Mr. Hecht on multiple occasions, which are documented in

15     text messages including that his lawyer, Pamela Mackey,

16     would make mincemeat out of her should she cooperate with

17     law enforcement.

18          Now it's just been brought to our attention that

19     Mr. Hecht has potentially violated his bond violations

20     with relating to the drug testing.  I'm not -- this was

21     the first time that that was brought to our attention

22     although we had requested to be kept apprised of what was

23     happening.

24          Now if Your Honor would indulge me, I'd like

25     approach the bench to share some information --

1          THE COURT:  -- would you like all three of you

2    -- I think you asked me that one time in this case so if

3    all three of you want to come forward, we have a sound

4    muffler.  We'll see what --

5          (Whereupon, the following was held at the bench

6    out of hearing of the general public in the courtroom.)

7          THE COURT:  Let her come in.

8          MR. BOVINO:  Sure.  So in our view, and this

9    been kept out of the public domain and I think for -- for

10   good reason and one of them is we believe the District

11   Attorney didn't believe this was relevant but the victim

12   was pregnant and carrying Mr. Hecht's child during the

13   night of the assault.  She was clearly at a -- you know --

14   eggshell state while she was attacked and in fact, the

15   fetus was not surgically removed until almost six weeks

16   after the attack.  This fact, we believe, is an

17   exaggerated circumstance which should be taken into

18   account by the Court.  There's substantial 404B evidence

19   relating to other victims of Mr. Hecht who claim that they

20   have been assaulted in extremely egregious ways.  One of

21   them is --

22          UNKNOWN FEMALE:  -- I can't hear you.

23          MR. BOVINO:  One of them is a longtime Aspen

24   resident who has contacted the District Attorney's Office

25   and alleged that Mr. Hecht had --

```
 1            MS. CALOIA:  -- wait a minute --

 2            MS. MACKEY:  -- this is wholly --

 3            MS. CALOIA:  -- this is very, very inflammatory

 4   --

 5            MS. MACKEY:  -- this is wholly improper and it's

 6   directly opposite -- this whole notion that she's six

 7   weeks -- that she's pregnant is not in the discovery.  In

 8   fact, to the contrary she's had an abortion

 9   (indiscernible).  So this is all --

10            THE COURT:  -- I thought I read that somewhere

11   --

12            MS. MACKEY:  -- yes --

13            THE COURT:  -- but I don't know where.

14            MS. CALOIA:  I have no information she was

15   pregnant for six weeks afterwards --

16            MS. MACKEY:  -- I've never heard that --

17            MS. CALOIA:  -- I've never heard that and Your

18   Honor knows that if I try to put in 404B on a completely

19   unrelated and not a similar type incident you wouldn't

20   allow it to come in.  There -- I don't have any other 404B

21   evidence to bring to the Court.  I filed no motion and --

22            THE COURT:  -- I was going to say, I haven't

23   seen a motion about that.

24            MS. CALOIA:  It's not there that I can find.

25            MS. MACKEY:  So I would object to any of this.
```

1          THE COURT:  Have you given her the information?

2          MR. BOVINO:  She -- we're aware that she is

3    aware of it -- that the --

4          MS. CALOIA:  -- I just said this judge wouldn't

5    allow it in as 404B evidence.  That's one incidence -- one

6    --

7          MR. BOVINO:  -- we corresponded --

8          MS. MACKEY:  -- he has no place in this --

9          MR. BOVINO:  -- we corresponded with the

10   District Attorney and she told us that she refused to

11   discuss with us any 404B evidence in this case or to

12   disclose to us anything that she was aware of.

13         MS. CALOIA:  That's right.

14         THE COURT:  Okay and the -- I'm having this

15   conversation here because --

16         MR. BOVINO:  -- well --

17         THE COURT:  -- instead of out there --

18         MR. BOVINO:  -- well, because a lot of this

19   information, frankly, is very sensitive and personal to

20   the victim and to the extent that it doesn't need to be

21   broadcast to the public.  I don't think that it needs to

22   be but I do think it's prudent to bring it to the Court's

23   attention at this point in time.

24         THE COURT:  Okay.

1          MS. CALOIA:  It's inflammatory and untrue.  My

2     whole problem with this case is the provability of the

3     case because of the things that the victim is saying

4     through her attorney such as she was pregnant.  The only

5     evidence I have is that she had gotten an abortion and she

6     was having complications from that abortion by bleeding on

7     the day of the incident and she went to the hospital to

8     get cleaned out, for lack of a better phrase.  That's all

9     I know and so now there's this information, which may or

10    may not true, and quite frankly, that's the whole problem

11    with the case.

12          MR. BOVINO:  We have the medical records.  The

13    victim did not release the medical records --

14          MS. CALOIA:  -- well, then my --

15          MR. BOVINO:  -- she was prepared to before

16    Michael Warren resigned.

17          MS. MACKEY:  Your Honor, I object to this.

18          THE COURT:  I -- I -- you've got to go back

19    there.  Make your statements with discretion --

20          (Whereupon, the noise buffer was turned off and

21    the following was held in open court.)

22          THE COURT:  -- to protect your client.  Thank

23    you.

24          MR. BOVINO:  Okay.

1          THE COURT:  Okay.  So you object to the plea on

2    behalf of the victim, Ms. Warfel, because you don't

3    believe it's fair and just.

4          MR. BOVINO:  Correct.

5          THE COURT:  You believe that Mr. Hecht is guilty

6    of -- and I think this is clear that you believe he's

7    guilty of a felony, that there was serious bodily injury,

8    that it should have been a second degree assault.  Judge

9    Lynch has, of course, ruled on that and I think that's

10   where we left it.  So if you wanted to continue from there

11   as to Ms. Warfel's observations about this plea and why

12   it's not fair.

13         MR. BOVINO:  Well, I think -- you know -- from

14   my initial comments does provide the gist of the objection

15   to the plea, in addition to the statements provided in Ms.

16   Warfel's letter to this Court.

17         THE COURT:  Okay.

18         MR. BOVINO:  Thank you.

19         THE COURT:  Thank you.  All right.

20         MS. CALOIA:  Judge, I would like to respond --

21         THE COURT:  -- yes --

22         MS. CALOIA:  -- to those -- uhm -- there was a

23   911 call.  I know that Ms. Warfel stayed there afterwards

24   and I'm not going to say too much about that, whether Mr.

1   Hecht called them back and lied or didn't lie, whatever

2   happened, I'm not using that.

3           As far as being held hostage for 12 hours or

4   more, that claim by the victim was only made after my

5   office informed Mr. Bovino that in order to have that kind

6   of a charge, we had to have someone being held hostage for

7   12 hours or more.  Then that allegation was made.  Quite

8   frankly, it wasn't in any of the reports.  It wasn't in

9   any of her statements that she had been held there against

10  her will at any time.

11          I have, in fact, interviewed the maids that

12  helped her move out after the incident.  They alleged

13  nothing to that regard and tell me that Ms. Warfel was

14  going back and forth into the house and carrying her

15  things and putting them in a car and going to her place

16  and so I just have no evidence that that particular

17  element was there.

18          As far as the damaged items, Ms. Warfel did make

19  an allegation that Mr. Hecht took her jewelry, which was

20  in some form of a bag, threw it on the floor and stomped

21  on it to ruin it.  Ms. Warfel said that she had lied about

22  that to the officer, showed the officer jewelry in a bag

23  that she had and the jewelry was completely intact.

24          That's all I know.  Never saw any damaged

25  jewelry, any damaged items that somehow turned into a

1   felony at some point through the allegations of Ms. Warfel

2   through her attorney, Mr. Bovino.  That -- whether that's

3   true, I don't know but have absolutely no evidence of that

4   and in fact, have contradictory evidence of that.

5          I also don't have evidence of him harassing her

6   and her friends after the incident.  So -- uhm -- that's

7   what I'd like to say.

8          THE COURT:  Okay.  Thank you.  Ms. Mackey, would

9   you like to say anything?

10          MS. MACKEY:  As far as the plea being just, we

11   -- we think that it is.  I obviously will have comments

12   when the Court moves forward to sentencing but I think

13   they're better reserved for that point in time.

14          THE COURT:  Okay.  Thank you and then I'm going

15   to read this letter to the extent that it has something to

16   do with the acceptance of the plea.  I think this is a

17   good time to read it.

18          She says that she just learned that Nikos Hecht

19   will be entering a change of plea on February 24 in

20   response to a plea deal offered by the Pitkin County

21   District Attorney's Office.  Unfortunately, she's

22   travelling and wanted me to understand the significance of

23   the events experienced on July 26 and 27 at the hands of

24   Nikos Hecht.  This was not an isolated incidences --

25   incident as there were others like it in jurisdictions in

1   and out of -- in and outside of Pitkin County including

2   Eagle County and elsewhere where Mr. Hecht physically

3   assaulted me such that I feared for my own life when he

4   was belligerent.  Those physical assaults were typically

5   accompanied by a barrage of humiliating and degrading

6   verbal attacks, the sting of which was often as horrific

7   as the physical ones.

8           The audio tapes provided to the District

9   Attorney capture only a small fraction of the harrowing

10  experiences where I was threatened by Nikos Hecht.  If the

11  Court has not listened to the audio tapes that I provided,

12  I would hope that Your Honor would do so before Mr. Hecht

13  is sentenced because they would provide a glimpse into the

14  mind of Mr. Hecht and it is quite different from the

15  picture that he would play to the Court.  He is a very

16  violent and abusive person and I fell deeply in love with

17  him but his mental and physical abuse could only be

18  suppressed for a short time.  It was a continuous cycle of

19  abuse.  I have lived in constant fear, was forced to leave

20  Aspen, a city that I call home, and have been forced to

21  change my life completely because of the fear of running

22  into him and the violence that could lead to.  I also fear

23  for the safety of my family who he has also threatened he

24  would harm.

1      As the victim here, I must confess this process

2  has been both frustrating and disappointing.  While I will

3  not repeat the words of my attorneys in their various

4  filings, as I'm sure Your Honor is familiar with them, I

5  do not believe that the District Attorney adequately

6  protected my interests or those of others in this

7  community that will likely fall prey to Mr. Hecht.  The

8  unfortunate fact is that Mr. Hecht enjoys abusing women

9  and because of the favorable treatment he has gotten from

10  the District Attorney's Office through his influence and

11  wealth, he will continue to abuse women.  What is even

12  more troubling is that the District Attorney is aware of

13  that history and yet decided to treat Mr. Hecht with

14  deference.

15      This Court has an opportunity to hold Mr. Hecht

16  accountable for his actions.  I hope that the Court, in

17  fact, takes a stand and lets Mr. Hecht know that his

18  behavior towards women is not acceptable and punishes him

19  accordingly.  Otherwise, Mr. Hecht will continue to

20  believe that he can get away with his violent and

21  reprehensible behavior towards women.  Thank you very

22  much, sincerely, Brooke Warren Warfel.

23      I read this letter as resignation on her part

24  that there is a plea and that I'm going to accept it.  I

25  read it to address the sentence more than the plea because

1   we all know that plea bargains are an essential part of

2   the criminal process and in order to avoid a trial where

3   evidence is presented in a way that sometimes is

4   surprising to everyone involved and in a way that is

5   detrimental to them.  Actually, the whole process can be,

6   not abusive, but traumatic.  It can continue with the

7   trauma for everyone.

8          Ms. Caloia certainly knows that and Ms. Mackey

9   certainly knows that.  I don't know if Mr. Hecht knows

10  that but anybody in the law enforcement and judicial

11  system knows that plea bargains are made every day and

12  they are usually to accomplish the goal of a addressing

13  the harm done and to have someone be accountable for what

14  they have done.

15         I read the arrest warrant and to me, it was a

16  night of terror.  It was a night of terror that lasted for

17  two days.  It was indicative of a pattern, I thought, in

18  reading it.  One of the statements that -- well, and then

19  there was a retraction, which is also very typical in the

20  cycle of abuse and blaming the victim and all of those

21  things that we talk about in this case, we talk about in

22  every single case.  There was a time when domestic

23  violence wasn't even prosecuted because the next day the

24  wife would say, I need the money.  I have three children.

25  Please, I take it all back.  Please, I can't live without

1   support and the cycle of violence usually includes, not

2   just the retraction for everything to be settled but the

3   flower and the roses and the I'm so sorry and the makeup.

4   It's a complex field.  It really is and it's changing

5   times that have brought us here in a good way -- in a good

6   way because having been a prosecutor 35 years ago, I can

7   tell you it was a -- it was a tough situation where people

8   were getting hurt, hurt, hurt, hurt and nothing anybody

9   could do about it.

10          The plea to harassment is a plea of guilt and an

11   acknowledgement by Mr. Hecht more than even in his

12   statement here, which I didn't like I have to tell you

13   that I may have bruised her.  You did bruise her.  I may

14   have wanted to -- well, you told me that you agreed that

15   it was with the intent to alarm and annoy so I appreciate

16   that -- as part of the accountability.

17          I think the obsessive nature of -- of the power

18   and control and the abuse that you exhibited in what I

19   have as the transcript.  I haven't heard it but -- and the

20   113 phone calls, I said this before, is indicative of

21   significant drug abuse as well.

22          Am I going to accept this plea?  I am.  I'm

23   going to accept this plea because it is better than a

24   trial.  It just is.  It is better that we -- everybody,

25   especially Ms. Warfel, is able to move on with her life,

1   not being under a microscope, not being blamed for being

2   abused, which is kind of what's happened and it's

3   sickening and I don't even think it was Mr. Hecht's doing.

4   I think it was the process.  I don't think he deliberately

5   went out to smear her in the newspapers but certainly it

6   looked like that's what happened and it's a shame.  It's a

7   real shame.

8          Sometimes I wish that the process was quicker

9   and faster and people could come in and say -- you know --

10  I did it.  Let me make amends.  Let me make amends.  Let

11  me change what I've done and maybe you'd still be

12  together.  I don't know if that was the process.  The --

13  the -- I fully believe that you helped her right the

14  retraction and the statements.  I just fully believe that.

15  I fully believe that you said, thanks, Brooke, I'm going

16  to serve a mandatory 10 years if you tell them and then it

17  runs off the screen and I'm like what?  What?  What is it

18  that she was going to tell that was a mandatory 10 years?

19  Drug charges have mandatory 10 years.  Sexual assault has

20  some mandatory penalties.  I just don't know what it is.

21  I don't know if you're willing to tell me but that's,

22  like, what is going on in that relationship.

23          Do you want to tell me what was off the screen

24  or --

1           THE DEFENDANT:  Actually, I honestly don't what

2    --

3           THE COURT:  -- what that reference was back then

4    --

5           THE DEFENDANT:  -- no, I don't what is -- what

6    10 years represents for various crimes.  I'm not even --

7           THE COURT:  -- for you.  Why did -- did you say

8    that?  It says that the police heard this on an audio.

9           MS. CALOIA:  No, it was in a text message.

10          THE DEFENDANT:  I don't --

11          THE COURT:  -- it was a text message.

12          MS. CALOIA:  That's where you read it.

13          THE COURT:  That's why it would run off the

14   screen.  Right.  That makes sense.

15          Anyway, do you admit that this was a night of

16   terror?  Was it more than just pulling her -- her -- uhm

17   -- purse?

18          MS. MACKEY:  Your Honor, he's admitted to the

19   factual basis that we agreed upon and the other charges

20   have been dismissed.

21          THE COURT:  Well, they will be if I accept it.

22          MS. MACKEY:  Yeah, if you accept the plea which

23   you've indicated that you will and so, to the extent that

24   you -- you know -- we're talking about the factual basis

25   for this plea, I think that's appropriate but the

1    dismissed charges, her allegations, which quite frankly

2    have been all over the board, I mean I just don't think

3    that's appropriate here.  For the domestic violence

4    counselor, for treatment and that sort of thing,

5    absolutely, but to have him -- you know -- in open court

6    engage in this, I just don't think it's appropriate given

7    what the plea is and that if the Court's going to accept

8    this, as you've indicated, the other charges were

9    dismissed.

10          THE COURT:  Okay.  Okay.  I will accept the

11   plea.  Let's go to sentencing.  Ms. Caloia.

12          MS. CALOIA:  Judge, obviously, these two had a

13   contentious relationship and it culminated in this

14   incident in which, I hope Mr. Hecht agrees, was

15   inappropriate on his part.  I'm not sure if it was a night

16   of terror or an hour of terror but there were some very

17   inappropriate things that were said and done.  However,

18   this is not unusual or different.  It is fairly typical of

19   a domestic violence situation that people do get

20   themselves into and I do believe that sex -- domestic

21   violence treatment is appropriate.  The evaluator will

22   make the determination of the number of weeks that he

23   needs to attend based on the evaluation and he needs to

24   complete those and participate in those.

1          As far as anything else, I'm going to leave that

2    up to the Court as far as whether there's drug and

3    alcohol.  I think drugs are a problem for Mr. Hecht.  He,

4    more than anybody, should recognize the problem and where

5    it has gotten him but I'm going to leave that up to the

6    Court as far as how the Court wants to handle that.

7          THE COURT:  Okay.  Thank you.

8          Ms. Mackey.

9          MS. MACKEY:  Thank you, Your Honor.  Your Honor,

10   I'm a little disturb that the Court has taken as its point

11   of reference the most extreme statement by Ms. Warfel, a

12   statement actually crafted by her lawyers in large part.

13   This is a case that has enormous proof problems for the DA

14   because Ms. Warfel has told so many different stories and

15   I really would ask the Court not to lose sight of that and

16   yes, I understand the cycle of violence.  I understand the

17   cycle of retraction but there's also things that cause

18   people to change their story which they're not telling the

19   entire truth.

20         The fact of the matter here is that Ms. Warfel

21   claimed that she was pushed to the ground and sustained a

22   head injury.  The deputy that took the statement looked

23   for that head injury.  There was none.  As Ms. Caloia

24   indicated, she interviewed the two maids that helped Ms.

25   Warfel move out of Mr. Hecht's home and into her own

1   apartment, an apartment that she had throughout her

2   relationship with Mr. Hecht, a process that took hours to

3   move from one to the other.  At no time did she indicate

4   that she was injured to either of the maids and one of

5   those maids had actually worked for Ms. Warfel long before

6   she had worked for both Mr. Warfel -- Ms. Warfel and Mr.

7   Hecht so her loyalty was to Ms. Warfel.  Never saw any

8   injury, never heard any complaint of any injury, never

9   sought medical help during the hours that it took to move

10  from one residence to the other.

11         You have the factual basis before you that we

12  have agreed upon with the Office of the District Attorney.

13  It captures what was happening on July 26th and that is

14  Ms. Warfel was leaving.  She was taking with her a large

15  pouch that Mr. Hecht believed contained jewelry although

16  she claims at one point it was damaged, at another point

17  she shows that jewelry and there's no damage to it -- one

18  of the many contradictory stories that we have in this --

19  in this case and he believed, at the time, that there were

20  wristwatches and other heirloom pieces in that purse.  He

21  tried to get it, pulled on her, pulled the strap on her

22  arm and it appears that there's a bruise in that area.

23  Those pieces remain missing to this day.  They are gone

24  from Mr. Hecht's house.  They have not been returned

1    despite requests.  They're not there.  We assume that

2    they're in the possession of Ms. Warfel.

3          The Court said in its remarks when people are

4    hurt, hurt, hurt -- uhm -- domestic violence is absolutely

5    devastating.  I understand that and there were for many

6    years.  I'm the same vintage as the Court, where domestic

7    violence was not properly prosecuted but in this case,

8    other than the bruise on the arm, there is no indication

9    of injury.  That's why the District Attorney really had

10   to, under her ethical obligation, dismiss the third degree

11   assault.

12         As the Court knows -- uhm -- let me -- once

13   again, leap back to what the Court said, which is it would

14   be lovely to have these matters quickly resolved.  From

15   Mr. Hecht's point of view, we have very quickly tried to

16   resolve this case.  We set it for trial on the very first

17   instance because she didn't have any offer and we tried to

18   move this towards resolution as quickly as possible.  We

19   were prohibited from doing that because of Ms. Warfel's

20   agitation for a special prosecutor, both in the District

21   Court and in the County Court.  The moment this Court

22   ruled that the special prosecutor would not be appointed

23   with regard to the County Court matter, I e-mailed Ms.

24   Caloia.  We resumed plea negotiations and that's what

25   brings us here today.  So we have not dragged our feet,

1  not in any way, shape or form but our hands were tied.  We

2  couldn't do anything as long as those requests were

3  pending.

4          As the Court may know from the District Court

5  case, and certainly what the Court knows from this case in

6  reviewing the police reports and lots of other material

7  that has been provided to the Court, there was initial

8  reluctance on behalf of Ms. Warfel to file this suit -- to

9  participate in the -- I'm sorry -- in the filing of

10  charges.  She objected to that strenuously.  Once those

11  charges were filed, I received a call from Mr. Bovino and

12  within in 90 seconds of being on the phone, he asked me

13  how I wanted to settle the civil suit.  There was no civil

14  suit.  That was code for what were we willing to pay Ms.

15  Warfel.  That was in August of 2015.  I refused to

16  participate in that conversation.  Mr. Hecht hired civil

17  counsel and that resulted in filings in the District

18  Court, which the Court may or may not have reviewed.

19          This was an incredibly unfortunate Sunday in the

20  life of Mr. Hecht and Ms. Warfel.  We have tried to

21  resolve it quickly.  We've been stymied by that.  The

22  moment we were able to, we are here trying to resolve it

23  to avoid exactly what the Court has alluded to which is a

24  painful process, days in this courtroom, exposing people's

1   most private actions and thoughts.  It's miserable.  We've

2   been through that.  They're awful.

3       Mr. Hecht has taken responsibility.  He's always

4   taken responsibility in this.  He's accountable for it.

5   He's here to enter his plea to what he believes, based on

6   being there, happened on July 26th.  I think it's an

7   appropriate resolution to a very unfortunate circumstance.

8   Domestic violence counseling we know the Court will order

9   it -- you have to by statute -- the evaluation and

10  counseling.  Mr. Hecht has already asked me to contact

11  people to begin that process.  I have done that.

12      He has been on monitored sobriety since mid-

13  October of 2015, four months and as the Court indicated,

14  Mr. Adams reported to me, as well as it sounds like to the

15  Court, that there was one positive UA.  That was on

16  January 13th.  The UA on the 11th was negative and the UA

17  on the 14th was negative.  Mr. Hecht has a legitimate

18  prescription which is on file with Mind Springs for

19  lidocaine.  It's a patch that he uses for back pain on an

20  as needed basis.  His back was acting up.  He had done --

21  he had put that patch on.

22      If the Court looks at the screen that's done, it

23  says specifically that this is merely a screen.  It

24  doesn't tell you what exactly is being tested for and if

25  you want to know the precise substance then you have to do

1    a gas chromatograph mass spectrometry to drill down on

2    that.  I checked with the toxicologist, Kathy Verdeal, and

3    asked her could lidocaine give you a positive for cocaine

4    and she said yes, absolutely, that can happen.  You would

5    have to run the gas chromatograph in order to tell.  So

6    Mr. Adams was not concerned about the positive UA on the

7    13th and so there was no revocation for that in large part

8    because the next day it was negative, so -- as I

9    understand it from him.

10            I assume that part of what the Court will order

11    will be continued to have no contact with Ms. Warfel.  We

12    welcome that.  There is no desire on behalf of Mr. Hecht

13    to contact Ms. Warfel in any way although the Court has

14    mentioned restorative justice and Mr. Hecht has asked me

15    about that process and would welcome it personally, given

16    the history of this case, I'm not sure that it would be

17    very productive.  If the Court wants us to try, we most

18    certainly will.

19            There will be ongoing contact at the conclusion

20    of this case, not through Mr. Hecht and Ms. Warfel but

21    their lawyers.  He has property that he needs returned to

22    him.  I've asked everybody to wait until this case was

23    over but she has a vehicle.  She has jewelry.  She has

24    lots of things that belong to Mr. Hecht that he needs to

25    get back and that will be negotiated through the civil

1    lawyers with whoever chooses to represent Ms. Warfel on

2    that matter but that will not happen directly between --

3    between them but I did want to alert the Court to that

4    that is going to be ongoing.

5         Your Honor, in short, I would ask that the Court

6    impose a probationary sentence in this case.  Mr. Hecht

7    has no criminal history.  This is a Class 3 misdemeanor.

8    This is the first time before the Court.  He will, I can

9    assure the Court, participate meaningfully in the domestic

10   violence counseling that is required -- if it is required

11   after an evaluation.

12        I'd like the Court to take into account that he

13   has already been on four months of monitored sobriety and

14   with -- except for the one positive on January 13th that

15   I've already spoke to -- many, many others -- I didn't

16   count them but I think there were in excess of 25 or 30

17   random UAs have been negative.  So all this talk about him

18   being a drug addict and drugs and alcohol being a problem,

19   well, not according to the last four months of tests and

20   that's significant.  They've been random.  They've been

21   administered by an agency that the Court trusts and uses

22   on a regular basis and there's no indication in the last

23   four months that it's a problem so he has not missed any.

24   He's done what he's required to and there's been no effort

25   -- no even question by Mr. Adams that there has been

1   noncompliance with that.  I've been in contact with him on

2   a regular basis, called him when we got the January 13th.

3   We talked about that.  So to the extent that there are

4   issues at Mind Springs about this drug and alcohol

5   evaluation, it just was not brought to my attention.  I

6   don't think my client understood it.  We'll be happy to do

7   whatever the Court needs on that and I'll follow through

8   and make sure it gets done.  I just was not aware of it.

9           So, in closing, Your Honor, I would ask that a

10  probationary sentence be granted with the domestic

11  violence evaluation and whatever treatment is ordered and

12  that both parties be allowed to move on at least from this

13  criminal case and begin the healing there.

14          The civil wrangle appears not to be close to

15  resolution on either side.  Thank you, Your Honor.

16          THE COURT:  And was she his fiancée or not?  Is

17  that something I read somewhere that I -- in the paper or

18  was she engaged to be married to Mr. Hecht?

19          MS. MACKEY:  She certainly believed that she was

20  his fiancée.  There was a trip planned around that.  It

21  was sort of a moving target I think would be the best to

22  say but I think she truly believed that.  I don't take

23  issue with her belief on that at all.

1           THE COURT:  All right.  Thank you.  Mr.

2    Peterson, are you sure Mr. Adams didn't send you an e-

3    mail?

4           THE CLERK:  No, I do not have any e-mails from

5    him.

6           THE COURT:  Okay.

7           THE CLERK:  Nor do I have any reports that have

8    been filed with the Court.

9           THE COURT:  All right.  Thank you.  Mr. Bovino,

10   did you want to say anything about sentencing?

11          MR. BOVINO:  Yes, Your Honor.  So in law school

12   I think it was probably in my first day of law school we

13   learned that if you don't -- if you don't have the facts,

14   argue the law.  If you don't have the law, argue the

15   facts.  If you don't have the law or the facts, attack the

16   victim.  I think what we've just heard from interestingly

17   both the District Attorney to a certain degree and from

18   Ms. Mackey was manifestation of that doctrine.

19          Brooke was in love with Nikos Hecht.  He,

20   throughout the course of her relationship, was effectively

21   and essentially isolating Brooke, cutting her off to have

22   anything communications with her family or friends.  She

23   was unable to attend and be a bridesmaid in her best

24   friend's wedding because Mr. Hecht wouldn't allow it.  She

1   was effectively held prisoner in his home and her entire

2   spirit faded over the course of her relationship.

3          In the immediate days following the arrest when

4   there was this retraction by the victim, it was -- it

5   subsequently became clear through her process of

6   reunification with her family and her friends and the

7   people in the community who she interacted with that she

8   was suffering from the classic Stockholm's Syndrome,

9   feelings towards Mr. Hecht -- in other words identifying

10  with him and trying to understand and justify his actions

11  towards her which were not confined to what happened on

12  the night of this.

13         I apologize for that, Your Honor.  I thought it

14  was off.

15         THE COURT:  You're supposed to throw it on the

16  ground and stamp on it.

17         MS. CALOIA:  We need a 12-year-old here.

18         MR. BOVINO:  The actions and the events that

19  took place on the nights of July 27th and 28th were not a

20  confined incident.  There's substantial witness testimony

21  from the people who work for Mr. Hecht in his home, in

22  addition to family members and friend of Brooke who were

23  essentially totally cut off from being able to have any

24  communication with her but did have a brief window into

25  this relationship that she was in a very bad spot.  In

1  fact, it's worth pointing out to the Court that it was not

2  Brooke, the victim, who triggered or initiated the arrest

3  of Mr. Hecht.  In fact, it was her therapist, Perrin --

4  Dr. Perrin Elisha, who -- she had been treating Ms. Warfel

5  who was so concerned about what she had heard in those

6  treatment sessions that she called law enforcement and

7  requested a welfare check.

8          Additionally, Ms. Warfel's friend, who was

9  provided with a very brief snippet of some audio tape in

10  which Mr. Hecht can be heard to be choking Ms. Warfel so

11  much that she --

12          MS. MACKEY:  -- Your Honor, I just object to

13  this.  It's just not what is in the record and he doesn't

14  get to make this up out of whole cloth.  That's not been

15  produced to us.  That's just not true.

16          MR. BOVINO:  It is true.  It's in the record.

17          MS. MACKEY:  It's not.

18          MR. BOVINO:  It's on the audio tapes.  If you

19  hand the -- if you hear the transcripts you can see it.

20  If you listen to the audio tapes, you can hear her gasping

21  for -- for breath.  If you read the text messages, you

22  hear Mr. Hecht telling Brooke to tell law enforcement that

23  the choking was just some kinky thing between us and that

24  it wasn't actually some sort of act of control or

1   violence.  So when Ms. Mackey says that it's not in the

2   record, I'm not sure what record she's referring to.

3        MS. MACKEY:  Your Honor, we're trying to avoid a

4   trial and having all of this dirty laundry aired and we

5   can contest the record.  We're trying not to do that for

6   (indiscernible) and it's just wildly inappropriate to get

7   up here and be testifying about contested information and

8   record.

9        MR. BOVINO:  Ms. Mackey just said it wasn't in

10  the record.

11       MS. MACKEY:  Contested information that's not in

12  the record.  I stand corrected.

13       THE COURT:  I think what Mr. Bovino is trying to

14  do is say that his client is credible, that there is

15  evidence that supports her credibility.  The whole issue

16  is -- uhm -- for the trial would be whether or not what

17  happened as she says happened and you have -- I'm glad you

18  pointed out the 911 call was made by somebody else.  Is

19  that what you're saying -- by Elisha Perrin or Perrin

20  Elisha?

21       MR. BOVINO:  The 911 call was initially -- there

22  was a 911 call placed from Mr. Hecht's residence by Ms.

23  Warfel at which point the phone went dead and you can

24  listen to the 911 records.  Law enforcement called back

25  the Hecht residence.  Mr. Hecht answered the phone and

1    said that he was having some problems with his alarm and

2    that there was no need for anyone to come to the house.

3    So had he not lied to law enforcement, this whole night of

4    terror could have probably been avoided because law

5    enforcement would have come to his house.

6           Subsequently, when she was in fear for her life,

7    after a number of threats were made and physical violence

8    took place there was audio recording on her phone which

9    you have heard or at least in the transcript from which

10   was texted to her friend Rochelle Cory who listened to the

11   tape and immediately call the Aspen Police Department and

12   sent them the tape, which I believe ultimately made it to

13   your desk when you made the decision to execute the arrest

14   warrant.  Additionally Dr. Perrin Elisha, Brooke's

15   psychiatrist, made -- without any knowledge of any of what

16   was going on, based on her therapy sessions and

17   consultations with Brooke -- placed a welfare check

18   because she was concerned that Brooke was in a

19   relationship where domestic violence was escalating.  She

20   was concerned for her wellbeing.

21          So the 911 call that was placed by Brooke -- uhm

22   -- when it was responded to by law enforcement, Mr. Hecht

23   lied and I don't think that's disputed by anyone because

24   all you need to do is listen to the 911 call, which is

25   part of the record.  I think that, in and of itself, is a

1   felony to lie to law enforcement when 911 is called but

2   I'm not going to be the authority on that issue.  I'll

3   leave that to the District Attorney.

4          With regard to Ms. Mackey's contention that

5   there's going to be no more contact between Mr. Hecht and

6   Ms. Warfel, we really do need to take that at grain of

7   salt.  Ever since this process or action was initiated by

8   the District Attorney's Office and law enforcement, which

9   Brooke initially requested that they not -- that that not

10  happen because she was concerned about retaliation which

11  was threatened by Mr. Hecht.  Brooke, her family, meaning

12  her mother, her father, her sister, every single person

13  who she's ever dated in her life, everyone that she's

14  knows in the community has been bombarded by private

15  investigators snooping into her life, either calling at

16  the -- you know -- at the behest of Ms. Mackey or Mr.

17  Hecht's lawyers and it hasn't stopped.  It's still going

18  on today and it will continue to go on.

19         Ms. Mackey speaks about a civil action and makes

20  these accusations that there was some sort of a request

21  for money in exchange for the dismissal of charges.

22  That's just not true.  In fact, before charges were

23  actually brought, interestingly enough, by the District

24  Attorney's Office, Brooke was provided with Ms. Mackey's

25  cellphone number -- and these are in the text messages --

1    and Ms. Mackey, the criminal defense lawyer for Mr. Hecht,

2    was texting back and forth with the victim and then

3    actually requested that she call her on the phone, which

4    she did and they had a conversation and it's my

5    understanding, according to Brooke, that Ms. Mackey says,

6    what do you -- what do you want?  What needs to be done to

7    make this go away and I just find it palpably improper

8    that a criminal defense lawyer is going to be talking with

9    the victim of domestic violence before an arrest is made.

10   It just -- it smells bad and if one were to look carefully

11   at the text messages, in the aftermath of the night of

12   terror as you referred to it, they're very telling in

13   explaining the timeline of events which ultimately led to

14   the arrest and the actions that were taken by Mr. Hecht

15   and his Counsel subsequent to that arrest, which included

16   -- I think two or three weeks transpired -- demand letters

17   from civil lawyers to Brooke making all sorts of demands

18   on property that belonged to her; that she was going to be

19   sued and that they intend to file lawsuit and I have no --

20   no doubt that Mr. Hecht's lawyers -- his civil lawyers and

21   the ones that I believed were retained and working with

22   Ms. Mackey will continue to endeavor to harass and re-

23   victimize Brooke once this is all resolved.  Whether Mr.

24   Hecht gets probation or some sort of slap on wrist, for

25   Miss -- for Brooke it's not over.  He's made himself very

1  clear that she has messed with the wrong person and I

2  believe that it's very unfortunate for her that what's

3  happening here today isn't the end but probably just the

4  beginning of a much longer draining re-victimization of

5  what's already happened to her during the course of her

6  relationship with Mr. Hecht.

7          With regard to the plea, I believe that Your

8  Honor is very familiar with the facts and circumstances in

9  this case and we will essentially defer to Your Honor's

10  good judgement in deciding what an appropriate punishment

11  is.

12          THE COURT:  Let me just ask you one thing.  The

13  bump on the back of the head -- is there any explanation

14  why there wasn't a bump?

15          MR. BOVINO:  Well, you know I see Monique

16  Merritt -- Deputy Monique Merritt sitting over here.

17  She's been here since the beginning and I've always been

18  interested in what her thoughts are in connection with

19  this case.  The -- Brooke fell on a cement floor when she

20  was trying to leave the home and hit her head.

21  Afterwards, as you know, she went to the hospital because

22  of a number of circumstances, which I'm not going to go

23  into right now, one of them being the assault -- uhm --

24  and she continued to communicate with Mr. Hecht in the

25  aftermath and he asked her to come over to his house.  She

1   didn't want to go -- you know -- finally he cajoled her to

2   go over to his house and he essentially told her if you

3   can make this go away -- uhm -- we're going to live a

4   wonderful life and -- excuse me -- and we're going to go

5   be ambassadors for Hilary Clinton and go on a boat with

6   Bono from U2 and do all these wonderful things and, like I

7   said, she was really in that Stockholm Syndrome state at

8   the beginning but she did do everything that she could to

9   protect him and one of the things with regard to the

10  allegation of bump on the head is -- my understanding is

11  Deputy Monique Merritt went to her apartment and checked

12  her and checked her head and Brooke said there's nothing

13  on my head and Deputy Monique Merritt confirmed that she

14  couldn't feel anything on her head.  I'll just note that

15  she did hit her head very hard, according to her, and I

16  believe her, and that at the time when she was examined by

17  Deputy Merritt, she was trying to protect Mr. Hecht from

18  getting arrested.  So I do believe she sustained -- you

19  know -- the injury to her head.  She could have had a

20  concussion.  We don't know.  She refused and did not have

21  my understanding is a CAT scan but she was extremely

22  disoriented in the -- in the hours and days after this

23  assault and she was also in an extremely weakened state

24  when she was attacked.

1          THE COURT:  Let me ask you about the pouch of

2    jewelry, the allegation in the warrant is that he removed

3    a pouch of Warfel's jewelry from her purse, emptied the

4    contents on the floor and smashed them and I think I heard

5    the District Attorney say that -- and Ms. Mackey, that

6    there were no smashed jewels.  Is that what she remembers

7    as well and --

8          MR. BOVINO:  -- no, my understanding of what she

9    remembers is that all the jewels and jewelry, whatever was

10   in her pouch which belonged to her which is very clear if

11   you read the text messages, which are all in the record,

12   and Mr. Hecht says that's yours.  He smashed everything on

13   the floor in a fit of rage and destroyed that property.

14   It was clearly cleaned up before law enforcement -- you

15   know -- was on the scene to the extent that they were and

16   she never has seen any of those jewels since that point in

17   time.

18          THE COURT:  And she's been covering up is what

19   you were saying, essentially trying to make less of the

20   charges.

21          MR. BOVINO:  Perhaps she was trying to do as Mr.

22   Hecht instructed her to do or else, which was make sure

23   that this could go away and -- you know -- it's my

24   understanding that Mr. Hecht's father was very closely

25   involved with trying to prevent this arrest from

1   happening.  Members of the law firm Garfield and Hecht

2   were on the case immediately after law enforcement was

3   brought into this.

4        MS. MACKEY:  Your Honor, I don't know what that

5   has to do with anything --

6        THE COURT:  -- I agree.  I agree.

7        MS. CALOIA:  I never got a call from Garfield

8   and Hecht nor did my office.

9        THE COURT:  Okay.  On the initial arrest.

10       MS. CALOIA:  On the initial and --

11       THE COURT:  -- you did for the violation of the

12  protection order issues.

13       MS. CALOIA:  Yeah, one --

14       THE COURT:  -- one call only.

15       MS. CALOIA:  One call, yeah.

16       MR. BOVINO:  Well, I think it's --

17       THE COURT:  -- and Ms. Mackey confirmed what I

18  said had said in my order -- I don't know if you read it

19  -- was that that very day when the search warrant was

20  being executed -- I think that's what it was -- Ms. Mackey

21  had indicated that she knew about the -- in other words,

22  why that was important was that it wasn't a recent

23  fabrication.

24       MR. BOVINO:  I'm not talking --

1          THE COURT:  -- she knew that before I did,

2   honestly.

3          MR. BOVINO:  I wasn't speaking -- I was speaking

4   about --

5          THE COURT:  -- about that -- just about the

6   original jewelry.

7          MR. BOVINO:  Sure.  Right after July 28th, 29th

8   and if Ms. Caloia was not on the scene, certainly, the

9   sheriff's office was on the scene and certainly, there's a

10  record of Sheriff Joe Disalvo meeting with Andrew Hecht,

11  talking about this and these were all -- all this

12  information is contained in the text messages between Mr.

13  Hecht and Brooke in the aftermath which was --

14         MS. MACKEY:  -- Your Honor, I don't know what

15  this has to do with sentencing of my client.

16         THE COURT:  I agree.

17         MR. BOVINO:  Okay.

18         THE COURT:  So go onto the next subject if you

19  have one or --

20         MR. BOVINO: -- okay, yeah, so -- you know -- I

21  was basically just -- you know -- in summation, with

22  regard to the sentencing, we would -- Your Honor has a

23  good sense of what happened and that there's more out

24  there perhaps than simply what happened on July 27th and

1   28th and we will defer to Your Honor's good judgement in

2   making the sentencing decision.

3          THE COURT:  Thank you.

4          MR. BOVINO:  Thank you.

5          THE COURT:  Mr. Hecht, anything you want -- you

6   want to say something, Ms. Caloia, before he does or after

7   he does.

8          MS. CALOIA:  It doesn't matter.

9          MS. MACKEY:  Mr. Hecht will not make a statement

10  at this time, Your Honor.

11         THE COURT:  Okay and Andrew Hecht is not here.

12  Is that right?

13         MS. MACKEY:  That's correct.

14         THE COURT:  I just wanted to make sure that --

15  of course, I know who he is and know him but he doesn't

16  intend to be here.

17         MS. MACKEY:  No, Your Honor.

18         THE COURT:  Okay.  Ms. Caloia.

19         MS. CALOIA:  I'd just like to say that one of

20  the problems with this case was the enormous amount of

21  material that Mr. Bovino was filing with the Courts in

22  various forms and I think Mr. Bovino thinks those are all

23  in the record, which I don't think is technically accurate

24  at this point and it certainly was unusual and led to a

25  lot of information getting out to the press because there

1    it was in black and white in the -- in the Clerk's Office.

2    I felt that that -- uhm -- undermined our case to a large

3    degree.  There were a lot of things in those pleadings

4    that were not true.  There are a lot of things in the

5    affidavits that were contradictory and it certainly made

6    my job a whole lot harder than it should have been and at

7    this point, I can't tell you what's true and not true from

8    all of those allegations that were made in all of those

9    pleadings because I just don't have any evidence of it at

10   all.

11            THE COURT:  And you're -- let me ask you, in the

12   arrest warrant it alludes to tape or recordings.

13            MS. CALOIA:  There was a tape --

14            THE COURT:  -- and I listened to them --

15            MS. CALOIA:  -- and I listened to the tape --

16            THE COURT:  -- and they are as written in the

17   arrest warrant.

18            MS. CALOIA:  And those are as written in the

19   arrest warrant, yes.

20            THE COURT:  Okay.

21            MS. CALOIA:  That is correct and those are the

22   statements that I alluded to as being nasty.

23            THE COURT:  Nasty, is that what you said?

24            MS. CALOIA:  Nasty.

1          THE COURT:  All right, controlling, intimidating

2   --

3          MS. CALOIA:  -- yes --

4          THE COURT:  -- revengeful, that sort of thing.

5          MS. CALOIA:  Yes.

6          THE COURT:  The acts of domestic violence.

7          MS. CALOIA:  Right.  The jewels, the --

8          THE COURT:  -- well, the F'ing --

9          MS. CALOIA:  -- all those things --

10         THE COURT:  -- slit your S -- you know -- the

11  whole -- those --

12         MS. CALOIA:  -- right --

13         THE COURT:  -- those kinds of words.  The you

14  choked me, stop, please don't hurt me.  Please, you choked

15  me.  Those are heard it says.

16         MS. CALOIA:  Those are heard, yes.

17         THE COURT:  On the --

18         MS. CALOIA:  -- on the tape.

19         THE COURT:  Ms. Mackey says that she was setting

20  him up, I guess, or pretending that this was going on but

21  those are heard recordings.

22         MS. CALOIA:  Yes.

23         THE COURT:  Okay.

24         MS. CALOIA:  That is correct.

1          THE COURT:  And on what was the other one?

2     Thanks, Brooke, I'm going to serve a mandatory 10 years.

3     That was heard.  That was a text message.

4          MS. CALOIA:  That was a text message.

5          THE COURT:  Okay and did she actually have a

6     recant statement, a written statement?

7          MS. CALOIA:  Yes.

8          THE COURT:  I don't know that I ever saw that

9     and you're absolutely right.  I don't know what I've seen

10    in which case but I have been looking at the arrest

11    warrant, just so you know.  That's what I'm really

12    focusing on because that is what I consider to be reliable

13    produced by Deputy Monique Merritt --

14         MS. CALOIA:  -- yes --

15         THE COURT:  -- it says what happened at least

16    what was heard, whether it's the truth or not, I guess is

17    another issue but it was certainly documented.

18         MS. CALOIA:  Yes.

19         THE COURT:  And far as restorative justice, I

20    forgot to ask Mr. Bovino.  Is there any -- have you talked

21    to the victim?

22         MS. CALOIA:  I have not talked to the victim.  I

23    am all in favor of restorative justice.  I think if

24    restorative justice was between the victim and the

25    defendant and other who are doing it it possibly could go

1   a long way.  If you included attorneys in there, forget

2   it.  Forget it.

3          THE COURT:  Right.  Okay.

4          Mr. Bovino, did you want to talk about that just

5   before I go forward?

6          MR. BOVINO:  Yes, Brooke is interested in the

7   whole concept of restorative justice and she appreciated

8   it as a suggestion by Your Honor.  We were hoping that --

9   uh -- Mr. Hecht or his Counsel would have broached that

10  subject with us but based on what we're seeing in terms of

11  actions done by Mr. Hecht through Counsel, it appears that

12  it's just not something that they're interested in.

13         I do just want to address a point that was made

14  Ms. Caloia, which related to the evidence that was

15  provided to the District Attorney's Office and the

16  Sheriff's Office and that would be that, as Your Honor

17  knows, Deputy District Attorney Michael Warren was

18  initially assigned to this case and subsequently resigned

19  for reasons --

20         MS. MACKEY:  -- Your Honor, you asked about

21  restorative justice --

22         MS. CALOIA:   -- and how is this relevant to

23  anything --

24         MR. BOVINO:  -- all of the evidence --

25         MS. CALOIA:  -- just to --

1          MR. BOVINO:  -- that she is claiming complicated

2    this case was requested -- you know -- from Mike Warren to

3    Brooke Warfel.  It wasn't brought --

4          THE COURT:  -- that she came in with stacks and

5    stacks.

6          MR. BOVINO:  No.

7          THE COURT:  He asked her for them, okay.

8          MR. BOVINO:  Michael Warren met with her --

9          THE COURT:  -- all right --

10         MR. BOVINO:  -- and spent many hours speaking

11   with her.  Mr. Caloia -- Ms. Caloia has never bothered to

12   call her and I've never actually spoken with Ms. Caloia

13   once, ever, except for today.

14         THE COURT:  Okay.  So, restorative justice is

15   something that she would be interested in.  That would

16   mean the restraining order would be modified to some

17   extent to --

18         MS. MACKEY:  -- I thought he said not

19   interested.

20         THE COURT:  Not interested, okay, I'm sorry.

21         MR. BOVINO:  When this hearing --

22         THE COURT:  -- I'm sorry --

23         MS. CALOIA:  -- and just for the record,

24   restorative justice is not mediation.

25         THE COURT:  It's not.

1          MS. CALOIA:  And so if --

2          THE COURT:  -- it's not --

3          MS. CALOIA:  -- it has nothing to do with the

4     civil claims either way.

5          THE COURT:  And we don't have a program in place

6     that I think would be valuable in this case.  I'm trying

7     very desperately -- I know you have Barb Chambliss and

8     Russ Griswell, but not really.  It's not really

9     restorative justice in a way that would work in this

10    particular case.  I would agree with all of you but I just

11    did want to know what her feelings were about --

12         MR. BOVINO:  -- when the -- when the suggestion

13    was first brought to our attention by Your Honor, we were

14    very interested in it.  We researched it.  We listened to

15    what Ms. Mackey had to say about it and her family

16    actually having something to do with creating the

17    doctrine.  Unfortunately, we just didn't get the sense

18    that anyone else was interested in exploring that avenue,

19    so we are where we are.

20         THE COURT:  Okay.  All right.  Thank you.

21         MS. CALOIA:  The last thing I'd just like to say

22    for the record is there was an e-mail that I saw that Mr.

23    Bovino and Counsel for Mr. Hecht were engaging in an

24    exchange in which Mr. Bovino did agree to ask me to drop

25    the charges if a settlement of money could be reached.

1          MR. BOVINO:  That's 100 percent false and I'm so

2    surprised that she would actually make that statement in

3    open court and I would actually request the opportunity to

4    bring that full note exchange to Your Honor's attention so

5    we can prove that Ms. Caloia's statement is just

6    flagrantly false.

7          MS. CALOIA:  Let's do it --

8          MS. MACKEY:  -- oh, my gosh --

9          THE COURT:  -- well, I need to --

10          MR. BOVINO:  Let's do it.

11          MS. CALOIA:  Let's see it.

12          THE COURT:  -- I need to take a rest for a

13    minute but maybe this can shed light on that, what I --

14    from all the other pleadings in the civil case and I did

15    read the District Court case as well.  It seems that what

16    Mr. Bovino is going to say now is that that was a

17    suggestion made by not Ms. Mackey but civil counsel.

18          MR. BOVINO:  They're all working together but

19    yes.

20          THE COURT:  But essentially that it was asked by

21    them for you to put that in the letter and then you

22    mistakenly did so, I guess --

23          MR. BOVINO:  -- well, first of all, that --

24          THE COURT:  -- regrettably did so --

1          MR. BOVINO:  -- that -- none of this was, first

2     of all -- you know -- as Your Honor is aware, there is

3     some very, very sensitive information about all the

4     parties in this case that is still not in the public

5     domain and there are seriously substantial civil claims

6     that we believe exist between the parties.  There was

7     discussions regarding those civil claims, in particular,

8     and you'll see by reading the full exchange that in a very

9     clever way, Mr. Hecht's Counsel tried to reframe the

10    issues as the parties would like to go to mediation but

11    they would like to advise the District Attorney that were

12    they to go to mediation they would like the charges

13    dismissed and --

14         MS. CALOIA:  -- it didn't say that --

15         MR. BOVINO:  -- and that's how the e-mail

16    exchange started and it goes on and on and on and it's

17    about a 20-page e-mail exchange and you'll read -- you

18    know --

19         THE COURT:  -- okay, let me ask you this.  Ms.

20    Warfel never has asked for jail.  Is that correct, for Mr.

21    Hecht?  Is that true or not?

22         MR. BOVINO:  Has she --

23         THE COURT:  -- you're not suggest -- not asking

24    that the Court impose jail.

1          MR. BOVINO:  I believe she does think that Mr.

2    Hecht should go to jail.

3          THE COURT:  Okay.  But you didn't say that today

4    and I'm not sure that I read it in any of the pleadings --

5    any of the -- whatever they're called --

6          MR. BOVINO:  -- no --

7          THE COURT:  -- affidavits or exhibits.  Correct?

8          MR. BOVINO:  Correct.

9          THE COURT:  Okay.

10          MR. BOVINO:  And as I said --

11          THE COURT:  -- she was all along trying to

12    resolve it in your mind.  Of course, it's contested by Ms.

13    Mackey, but all along she was trying to stay together

14    until --

15          MR. BOVINO:  -- until about --

16          THE COURT:  -- the newspaper and everything went

17    viral --

18          MR. BOVINO:  -- two weeks -- I think it was when

19    she got of his -- uhm -- let's see how do I frame this --

20    control -- when she was no longer under his control and

21    she began to reunite and reunify with her friends and

22    family and -- you know -- therapy that she realized that

23    she was totally brainwashed.  I think that's the point in

24    time where she realized that she was actually victimized.

25    Before then, I think she was actually identifying --

1        MS. MACKEY:  -- Your Honor, this is about the

2    third time we've gone through this.

3        THE COURT:  Okay.  I'm going to take five

4    minutes and let me ask you, what do you think about a

5    presentence investigation?  You don't think it's

6    necessary.

7        MS. CALOIA:  I really don't.

8        THE COURT:  Okay and you don't either.

9        MS. MACKEY:  I don't, no.

10       THE COURT:  Okay, even if I impose jail.

11       MS. MACKEY:  I don't think jail's appropriate

12   knowing this Court as I have seen --

13       THE COURT:  -- but you understand that I can do

14   that as a condition of probation and your client

15   understands that as well.

16       MS. MACKEY:  I understand that but I also know

17   that this is a very treatment-oriented court.  I've been

18   watching you sentence people for 30 years -- uhm --

19       THE COURT:  -- 15 -- I'm not that old --

20       MS. MACKEY:  -- 15 -- right, 15.

21       THE COURT:  I feel like it --

22       MS. MACKEY:  -- I've been doing this for 30

23   years, you've been doing that for 15 -- my apologies -- 15

24   years and yeah, I think that it's abundantly clear that

25   treatment's appropriate and consistent with what this

1    Court has done.  We're talking about a Class 3 misdemeanor

2    for someone who has no prior record and -- you know --

3    it's -- it's gotten blown up because of all of this other

4    stuff that's gone on and to my way of thinking, it

5    shouldn't affect -- you know -- the consistency that this

6    Court has shown in being a very pro-treatment court and --

7    you know -- not imposing jail on a Class 3 misdemeanor

8    with somebody that has no criminal history.  So -- you

9    know -- I just hope that the Court is not sucked into this

10   vortex of what's going on the civil side and all these

11   filings and that sort of thing and you look at what the

12   stipulated basis is and -- uhm -- stipulated factual basis

13   and --

14            THE COURT:  -- but let's clear that up, whether

15   there's a stipulate factual basis or not, I think the

16   Court can take into account what it perceives to be a

17   pattern of abuse.  I think I can do that and I have made

18   it very clear that I consider this not to be an isolated

19   instance where somebody out of the blue calls 113 times.

20   I said that before.  So I just wanted to -- you know --

21   make sure everybody is on the same page that I am going to

22   take a break and I'm going to come back but that jail is

23   actually a possibility, Mr. Hecht, whether I'm treatment-

24   oriented or not.  It could be suspended.  It could be

25   subject to certain conditions.  It could be a variety of

1    methods of implementation.  There's day reporting.

2    There's work release.  There are options for this Court

3    and she's absolutely right -- Ms. Mackey and Ms. Caloia

4    will confirm and Mr. Bovino knows it too that I am

5    treatment-oriented and I withstand criticism for it.  I

6    think there was some criticism in the paper that I read

7    about yesterday about a case that wasn't even mine about

8    an eighth DUI that did not -- and the seventh didn't occur

9    in Pitkin County --

10        MS. CALOIA:  -- so we get blamed for it whether

11   it's ours or not --

12        THE COURT:  -- and it was the District Court but

13   somehow Judge Ely's friends are benefitting from this.  So

14   you see what I mean and I have to say too that I -- uhm --

15   I don't want to punish somebody more just because they're

16   rich and wealthy and powerful.  That's something that --

17   you know -- concerns me as well.  Is that why I think what

18   I think?  It's not really that fair either.  Is this case

19   under a microscope because of that?  Probably.

20        Do I think Mr. Hecht is impressed with himself

21   and his status?  I think that he is and let me tell you

22   why.  Not only from the arrest but in the past there has

23   been in the paper statements that are attributed to Mr.

24   Hecht such as don't you know who I am and up in the -- uh

25   -- the hiking trail up in Snowmass.  So I just -- I mean

1   I, of course, read the paper like everybody else and that

2   isn't even a case that I had.  And do I know that there's

3   inaccurate reporting?  Of course, I do.  So I try very

4   hard -- you know -- keep this to what you know.  Keep this

5   to what you know but I wonder -- you know -- I think that

6   he had a relationship with a woman that he loved and she

7   loved him but the way it's painted is is it was just one

8   big using each other for other reasons and it's, again,

9   I'm -- it's very complicated.  It's a very complicated

10  scenario.

11          Do I have cases like this all the time?

12  Absolutely.  Do I have men and women who exercise power

13  and control over each other in completely inappropriate

14  ways?  Of course I do and I try to be individual and I try

15  to make a difference to those people and then even

16  sometimes when I want to impose jail -- there was one the

17  other day where the guy had a record and it was a caveman

18  kind of situation, pulling by the hair -- you know -- this

19  whole what I call nights of terror, yet he'd just had a

20  car accident.  They had a small child.  The mom -- you

21  know -- the woman was begging, please don't put him in

22  jail -- you know -- so each one of your situations -- you

23  know -- strikes me in a different way, I guess, and in the

24  same way and I do want to be consistent but I do want to

1  be specific to what I think is appropriate in a particular

2  case so I'm going to take five minutes.  Thank you.

3          (Whereupon, a recess was taken at 3:21:47.

4  Recording resumed at 3:35:27.)

5          THE COURT:  Is -- does anybody have any

6  objection to that?

7          MS. MACKEY:  I do, Your Honor.  She's a witness

8  in the case and we're trying to avoid a trial, not calling

9  witnesses -- uhm -- and I don't want to say anything more

10  because of --

11          THE COURT:  -- okay --

12          MS. MACKEY:  -- what could be interpreted as

13  insulting but I really do object to her -- to her coming

14  forward.

15          THE COURT:  Ms. Caloia.

16          MS. CALOIA:  I don't object.

17          THE COURT:  Okay.  I'm going to allow Deputy

18  Merritt briefly to make her observations.

19          DEPUTY MERRITT:  I will be very brief.  I think

20  most points that I have to make have already been made

21  today or in the arrest warrant.  I just wanted to really

22  encourage Your Honor to actually listen to the audio of

23  that night.  I know there's so much other stuff that's

24  been brought in that's perhaps relevant, maybe not, made a

25  big deal of but we're really here for that night of

1   terror, as you called it, and if you listen to the audio,

2   that's exactly what it is.  It's very different than

3   reading it in a transcript.  I think if you hear it, it's

4   unmistakable what happened that night and I just wanted to

5   ask you please to listen to it.

6           THE COURT:  Okay.  Thank you.

7           Well, that would delay the sentencing to listen

8   to it and I have to say that it does come alive to me --

9   the arrest warrant -- having enough experience with these

10  kinds of cases.  That's how I began.  It sounded like a

11  night of terror.  I've said that all along.  The 113 --

12  the excessive phone calls, the screaming -- you just -- it

13  does jump out at me.  I didn't get a chance to hear it

14  because we didn't have a trial and as everybody has

15  pointed out, the trial would have been long and protracted

16  and there would have been a lot of re-victimization, in my

17  view, of Ms. Warfel, which is what I said why I'm going to

18  accept this plea is because I don't want that to happen.

19  I honestly don't and I know what a good attorney Ms.

20  Mackey is and I know that she would be able to make a very

21  good case for Mr. Hecht and that's just a fact of life.

22  So to save her and to save all of us, I guess, from --

23  from that trauma I think this is a plea.  I think it also

24  does get a conviction for Mr. Hecht, as opposed to a not

25  guilty, which is a very real possibility in the world of

1   domestic violence cases and if you had a not guilty that

2   would be oh so bad for Ms. Warfel, I think.  I mean I just

3   think that would -- that's always the risk that one takes

4   and so a sure thing is a good thing.

5        So, as far as the events, I still -- I read that

6   -- those statements that Deputy Merritt put down in the

7   affidavit and I do think it was terror.  I do.  I think it

8   was abusive.  I think it was all the things that domestic

9   violence is about and I do hope that you get something out

10  of the treatment that is mandatory and I do hope that you

11  become a person that doesn't abuse women.  I hope that's

12  what happens.

13       So, the Court sentence is as follows:

14       It'll be 24 months of supervised probation.  The

15  first condition shall be no violations of any federal,

16  state or municipal laws.  You need to satisfactorily

17  comply with all conditions of supervised probation imposed

18  by State Probation, which can and probably will, include

19  monitored abstinence.

20       The mandatory protection order remains in effect

21  throughout the term of probation unless modified,

22  obviously, by a court of law.

23       You may not consume alcoholic beverages or

24  controlled substances for the duration of probation.  You

25  need to get an alcohol and drug evaluation and comply with

1   the recommended treatment.  We're going to go over the

2   evaluation and a mandatory appearance will be required and

3   this needs a calendar, I guess, availability but April 12

4   I was thinking.  The 5th is bad because it's a Public

5   Defender day and always so crowded but April 12 would be

6   the date that I would want to review that alcohol

7   evaluation and go over the treatment that is expected.

8   Does that work for you, Ms. Mackey?

9           MS. MACKEY:  Yes, ma'am.

10          THE COURT:  Okay and that will be at 2:30 p.m.

11          The Defendant will also obtain an evaluation for

12  domestic violence counseling at a state certified agency

13  and comply with the recommended treatment.

14          The fine is the maximum fine which is $750 for a

15  Class 3 misdemeanor and any court costs will be -- and the

16  court costs will be added by the Clerk.

17          The -- uhm -- as far as the jail sentence, what

18  I'm going to do instead of a jail sentence, because you

19  know that if you violate probation you always have those

20  six months hanging over your because any violation of

21  probation carries with it a possible resentence of up to

22  that.

23          I'm going to impose 120 hours of useful public

24  service and you need to do that 10 hours each month.  So

1    that will be a year's worth of useful public service at

2    the rate of 10 hours each month.

3         MS. CALOIA:  Can he do that quicker than 10

4    hours?

5         THE COURT:  No.

6         MS. CALOIA:  Okay.

7         THE COURT:  No, it has to be 10 a month so that

8    it is the drip method, the reminding method of your --

9    that you are being punished and also being reintegrated

10   into regular society.  That's one of the ideas of useful

11   public service.

12        The appearance -- in the automatic probation

13   termination date in two years -- do you have that?

14        THE CLERK:  I can get that.  It's going to be

15   April -- excuse me -- February 20th, 2018.

16        THE COURT:  February 20th and that's a weekday.

17        THE CLERK:  That is a Tuesday.

18        THE COURT:  Okay.  February 20th, 2018 unless

19   allegations of violations are filed and then you would be

20   entitled to a hearing or a trial if it's another -- if

21   it's a new offense it would have the ability to have a

22   trial in and of itself on that new offense.  Any violation

23   of probation, if you're found guilty of it, carries with

24   it a possible six months in the county jail.

25        Any questions, Ms. Caloia?

1          MS. CALOIA:  Advice of appeal rights.

2          THE COURT:  Thirty-five days from this issuance

3    of this sentence -- is that what it is now -- 35 days

4          MS. CALOIA:  -- 45 days --

5          THE COURT:  -- I get these seven-day things --

6          MS. CALOIA:  -- 45, 35 --

7          THE CLERK:  -- 35 --

8          THE COURT:  -- I think it's 35 for this court

9    and 45 for the other court.  That sort of took by surprise

10   because when you have a plea --

11         MS. CALOIA:  -- he can appeal the sentence, I

12   believe --

13         THE COURT:  -- and the sentence -- okay.  All

14   right.  So 35 days, would you agree?

15         MS. MACKEY:  Sure.

16         THE COURT:  Okay is that old person thing.  I

17   have the seven-day increments only -- it used to be 30

18   days and everything's changed to seven-day increments.

19         As far as the alcohol and drug evaluation, we're

20   going to go over that on April the 12th at 2:30 and as

21   concerns monitored abstinence, you need to contact the

22   Probation Officer by tomorrow, and he or she will be

23   Danielle Desinway (phonetic) or Shawn Brown, will advise

24   you as to what is expected of you with respect to

1    monitored abstinence and also domestic violence

2    counseling.

3              Any other questions?

4              MS. CALOIA:  No.

5              THE COURT:  Any questions?

6              MS. MACKEY:  Two, when you say we'll go over the

7    evaluation, you expect him to have the evaluation

8    completed before then.

9              THE COURT:  Yes.

10             MS. MACKEY:  Correct.

11             THE COURT:  Yes and bring it to court.

12             MS. MACKEY:  Okay and then secondly, you said no

13   controlled substances so long as he has a prescription,

14   not marijuana, but other controlled substances that's on

15   file with Mind Springs, that's acceptable.

16             THE COURT:  Do you already have some?

17             MS. MACKEY:  Yes.  Yeah.

18             THE COURT:  And they're obviously prescription.

19             MS. MACKEY:  Yes.

20             THE COURT:  And they are in doses as prescribed.

21             MS. MACKEY:  Correct.

22             THE COURT:  Then yes.

23             MS. MACKEY:  Okay.

1          THE COURT:  Okay.  Anything else?  Do you want

2     to -- you know Roger Ryan is the new coordinator for

3     useful public service, no longer Bev Campbell.

4          MS. MACKEY:  Oh, I didn't know that.

5          THE COURT:  And he's at the jail and can be

6     probably -- he's probably there right now.  You could

7     probably sign up right now.  It's $80 for registration and

8     he'll have the order sentence and know that it can only be

9     completed at 10-hour a month increments.

10          MS. MACKEY:  Would it be okay if we did both

11     probation and UPS signup tomorrow?

12          THE COURT:  Yes.  Okay.  Anything else?

13          MS. CALOIA:  No.

14          THE COURT:  No.  Okay, I do -- I wondered Mr.

15     Hecht if you wanted to apologize.

16          THE DEFENDANT:  I apologize and I feel terribly

17     about the who situation and I'll --

18          THE COURT:  -- have you done reflection -- have

19     you done some reflection about all of this?  Yes?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Yes.  Okay and do you appreciate

22     having it be in the paper so much?  Is that something

23     that's caused you pain or --

24          THE DEFENDANT:  -- it's awful.

1          THE COURT:  Okay.  All right.  So I don't know

2     what your parents told you but you should only be in the

3     paper for two things, when you're born and when you die

4     and if you're in there -- and of course, I'm in the paper

5     all the time but I don't think it means me -- the public

6     figure but I can't imagine what your family feels.  Right?

7     I mean the embarrassment that you feel, they feel ten-

8     fold.  Would you agree?

9          THE DEFENDANT:  I agree.

10          THE COURT:  Okay.  All right.  We'll see you

11     April 12th.  Thank you.

12          (Whereupon, this matter was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          TRANSCRIPTIONIST'S CERTIFICATE

2          I, Susan M. Antonelli, do hereby attest that the

3     above and foregoing is a true and accurate transcription

4     of the digitally recorded proceedings to the best of my

5     knowledge, skill and ability of the plea/sentencing

6     hearing in 2015M197 that took place in Pitkin County Court

7     on February 24, 2016, Aspen, Colorado.

8          Dated this 28th of February, 2016.

9

10

11

12                          /s/ via e-mail

13                     Susan M. Antonelli

14

15

16

17

18

19

20

21

22

23

24

25