IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number ___1:16-cv-686_____

BROOKE LAUREN WARFEL,

    *Plaintiff,*

v.

NIKOS HECHT,

    *Defendant.*

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

Plaintiff Brooke Warfel ("Ms. Warfel"), by and through her counsel, for her Complaint against defendant Nikos Hecht ("Hecht"), alleges and avers as follows:

### I.    INTRODUCTION

1.    When Hecht could not get his girlfriend (and purported former fiancée), Ms. Warfel, to do what he wanted, when he wanted it, and how he wanted it, he would berate and threaten her with chilling and unspeakable violence. Hecht would ultimately fulfill some of those threats, injuring Ms. Warfel physically and emotionally. In Hecht's own words, he threatened to:

> ... f***ing split you, p***y to mouth, before you f***ing survive without me. What, are you f***ing kidding me? Do you really think . . .

> * * *

> I would like to knock your f***ing teeth out...

> * * *

. . . Your mother should be shot for coming up to my house like that. I would like to shoot her. If I thought I could get away with it, I would f***ing put a bullet in her head . . .

\* \* \*

The only thing . . . is when I f***ing murder your b**ch-a** mother.

\* \* \*

Exs. 7 & 8. These are but a few examples of Hecht's routine and aggressive tirades. Hecht constantly manipulated and abused Ms. Warfel, including forcing her to obtain unwanted abortions and culminating to him actually physically assaulting her.

2.      Indeed, Hecht was recently convicted and sentenced, including two years of probation and controlled substance monitoring for assaulting Ms. Warfel. Judge Fernandez-Ely, who sentenced him, found that Hecht's conduct towards Ms. Warfel showed a clear "pattern of abuse," that Hecht was a an "obsessive man" with serious "power and control issues," and that Hecht put Ms. Warfel through nothing short of "a night of terror." The judge's words below speak for themselves:

> . . . [A]nd to me, *it was a night of terror*. It was a night of terror that lasted two days. It was *indicative of a pattern*, I thought, in reading it. One of the statements that – well, and then there was a retraction, which is also very typical in the *cycle of abuse and blaming the victim* and all of those things that we talk about in this case.

*People v. Nikos Hecht,* Case No. 2015M197, County Court, Pitkin County, Colorado, Hr. Tr. at 24, attached as Ex. 9 (emphases added). The judge later followed:

> I think the *obsessive nature* of – of the *power and control and the abuse* that you exhibited in what I have as the transcript. I haven't heard it but – and the 113 phone calls, I said this before, is *indicative of significant drug abuse* as well.

Ex. 9 at 25 (emphases added). The judge described Hecht as a man "who abuses women":

> I think [Hecht's actions against Ms. Warfel] were abusive. I think that it was all the things that domestic violence is about and I do hope that you get something out of the treatment that is mandatory and *I do hope that you become a person that doesn't abuse women*. I do hope that's what happens.

Ex. 9 at 65 (emphasis added). And finally the judge, reflecting on whether to send Hecht to jail for his conduct toward the woman victim in the case, said the following:

> I think the Court can take into account what it perceives to be *a pattern of abuse*. I think I can do that and I have made it very clear that I consider this *not to be an isolated instance* . . . So I just wanted to – you know – make sure everybody is on the same page that I am going to take a break and I'm going to come back but that jail time is actually a possibility, Mr. Hecht, whether I'm treatment-oriented or not.

Ex. 9 at 60. This was the judge's assessment of Hecht's abusive nature upon being exposed to a small window through Hecht's behavior. This Complaint seeks damages for Hecht's conduct, most of which was not the subject of the criminal proceeding.

## II.   PARTIES

4.      Plaintiff Brooke Warfel is a resident of Los Angeles, Los Angeles County, California.

5.      Defendant Nikos Hecht is a resident of Aspen, Pitkin County, Colorado, and is subject to the jurisdiction of this Court and is otherwise *sui generis*.

## III.   JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court pursuant to 18 U.S.C § 1332 and the amount in controversy is greater than $75,000.

7.      Venue is proper in this Court pursuant to 18 U.S.C §§ 1391(b)(1) and (2). Not only is Hecht a resident of Pitkin County, Colorado, but most of the events alleged in the Complaint occurred in Pitkin County, Colorado.

## IV.   GENERAL ALLEGATIONS

8.      Ms. Warfel and Hecht met in the Fall of 2013 and, in the spring of 2014, started dating, which turned into a more serious relationship. Ms. Warfel fell in love with Hecht, but, over the course of their two-year relationship, Hecht emotionally and psychologically manipulated Ms. Warfel, threatened her, blackmailed her, coerced her into getting multiple abortions, threatened her family, and, ultimately, physically assaulted her. As a result of Hecht's actions, Ms. Warfel suffered tremendous physical and emotional hardship, from which she is still recovering and some of which she may never overcome.

### A. Hecht Sought to Isolate Ms. Warfel From Her Friends, Family, and Therapist.

9.      From the very beginning, Hecht sought to isolate Ms. Warfel from her friends and family. Among other things, Hecht commanded that Ms. Warfel delete her Facebook and social media accounts, account for every minute of her time and immediately respond to his texts, calls and need for attention. Not only that, Hecht's personal use of illicit drugs and controlled substances became a central component of his strategy to control Ms. Warfel, as he would ultimately pressure her to use drugs with him if she was going to be with him.

10.     From a social standpoint, Hecht gave Ms. Warfel no latitude. When Ms. Warfel spent time with her friends, Hecht would send her repeated text messages asking what they were talking about and cautioning Ms. Warfel not to talk about him, repeatedly texting her regarding her whereabouts and frequently commanding that she stop what she's doing to immediately return to him. The frequency of his text messages, alone, while Ms. Warfel was spending time with friends, is alarming. Below, Hecht sends nine text messages pummeling Ms. Warfel with multiple questions in less than eight minutes, demanding to know whether she would be going back to his home:



11.     Throughout their relationship, Hecht regularly demanded Ms. Warfel's physical presence at certain locations, on a whim, and with dire consequences for failure to comply. When she failed to be where he expected her to be, he would threaten her in a variety of ways. By example, the following exchange is illustrative:



Hecht's mandate that Ms. Warfel be compliant and responsive was not limited to her physical presence. He also expected her to immediately respond to his text messages.

12.     By example, a July 3, 2014, text-message exchange between the two proves the point. That night at 9:21:47 pm, Hecht wrote, "You worry me [s]ometimes." Thirty-two seconds later, Hecht wrote again, "Are you reliable." At 9:22:40 pm—one minute and seven seconds after his initial text message—he wrote, "Gone again ☹." Within two minutes of his texts, Ms. Warfel tried to reassure him. She responded at 9:24:59 pm, again six seconds after that, and yet again three seconds after that stating, "I'm here babe. I had to excuse myself from the table." Far from what Hecht imagined, Ms. Warfel was simply having dinner and not checking her phone. But Hecht's need for Ms. Warfel's constant, immediate, and absolute availability became darker and eventually laced with threats of violence and/or criminal prosecution.

13.     One notable example shows Hecht telling Ms. Warfel that he "loved her," "always w[ould]," and then immediately telling her that he was going to call the police to make sure she

returned the engagement ring he previously gave to her simply because she was spending time

with her friends. The entire exchange took place in a span of less than ten minutes:



14.    Hecht was quick to threaten calling the police on Ms. Warfel for any unfounded

reason. On one occasion, Hecht gave Ms. Warfel **a mere 20 seconds** to respond before he would

call the police to accuse her of stealing suboxone—one of his go-to drugs:



Hecht repeatedly used this technique to demand Ms. Warfel to come to his house, even when Ms.

Warfel expressed stress over dealing with Hecht:



Though Hecht's personality was abusive on its own, with serious control and power issues and

constant threats and verbal abuse, his drug abuse brought his abusive and bullying nature to an

even higher level.

15.    During Hecht's relationship with Ms. Warfel, he used his wealth time and again to

hurt and manipulate her. One way he would do so was by giving her expensive gifts, such as

jewelry and watches, but always with strings attached; strings on which he yanked each time she

"misbehaved." When angered, he became cold and calculating, demanding that she return property as though he was ending a business relationship rather than gifts that were given to her in their relationship:



In response, Ms. Warfel would pour her heart to Hecht, begging him for forgiveness and understanding in an effort to appease his bouts of anger. But his responses remained focused on the material aspects of their relationship, such as where she should leave their "engagement" ring:



16.     Hecht's behavior is indicative of the typical patterns of domestic violence and abuse, whereby abusive partners isolate their victims from friends, family, and support networks to ensure complete dependence and compliance.

## B. Hecht Pressured, Cajoled, and Threatened Ms. Warfel So that She Would Have Multiple Abortions.

17.     In December 2014, Ms. Warfel became pregnant by Hecht. Hecht was adamantly opposed to the pregnancy (even though he willingly had sexual relations with Ms. Warfel knowing neither of them was using contraception and both had openly discussed the possibility of having a child with her). However, once the reality of another child set in, he made it clear he was no longer interested. In order to ensure that Ms. Warfel terminated the pregnancy, Hecht came up with a plan. He gave Ms. Warfel a ring, stated it was an engagement ring, and promised that the two of them would get married—but the implied threat was that it would not happen if she continued with the pregnancy.[1]

---

[1] This was a complete fabrication by Hecht. At his plea guilty hearing, Hecht's lawyer refused to acknowledge that Hecht was engaged to Ms. Warfel and instead massaged the situation by stating, "She certainly believed that she was his fiancée." Ex. 9, 36:16-23.

18.     Ms. Warfel wanted to keep the baby but after constant and unrelenting pressure from Hecht, she made an appointment in Aspen and began discussing the procedure with her physician. Her Aspen physician stated it was too early for a termination and that there was a chance the pregnancy was ectopic. As a result, attempting a chemical termination under those circumstances could have had devastating effects. She advised Ms. Warfel to wait.

19.     Although she did not want to have an abortion, wanted to marry Hecht, and have a family with him, Ms. Warfel told Hecht she would go forward with the termination. However, for medical reasons and in order to ensure her safety, it would have to wait approximately three to four more weeks. Because Hecht and Ms. Warfel had plans to go to Mexico, Ms. Warfel explained the abortion would have to wait until they came back or she would have to wait in Aspen until the time was right. This was not fast enough for Hecht and he wouldn't hear any of it. He insisted that she allow a "doctor" he knew in Mexico to terminate the pregnancy (against the orders of the Aspen physician who had actually examined Ms. Warfel). When Ms. Warfel expressed reservations about Hecht's plan, he responded that if she did not go through with the procedure on his schedule, he would have all her stuff packed in garbage bags, taken out of his house, dumped at her door, and that would be the end of their relationship. Ms. Warfel, in an attempt to smooth things over, agreed to go to Mexico, all the while continuing to have reservations about pursuing this plan. (As it turns out, Ms. Warfel's reservations were well-founded given that the "doctor" was actually closer to a nurse practitioner, certainly not an ob/gyn as promised by Hecht).

20.     When Ms. Warfel arrived in Mexico, she was met by "Dr." Omara Hirales. "Dr." Hirales, who also happened to be Hecht's source of controlled substances in Mexico, had a suitcase with the necessary tools to terminate Ms. Warfel's pregnancy. The two of them went upstairs and

Hirales gave Ms. Warfel drugs to terminate the pregnancy. This took place around December 20, 2014. Unfortunately, the results were traumatic and left her with long-term physical damages.

21.     After the procedure, Ms. Warfel began feeling excruciating abdominal pain, but with little to no bleeding. She repeatedly asked Hecht to help her, take her to a physician, or find a way to relieve the pain. Unfortunately, Hecht did the one thing he was good at: he gave Ms. Warfel very strong pain medication, to which she then became addicted. This is how Ms. Warfel became addicted to narcotics and eventually led to her use of suboxone in an effort to combat the addiction.

22.     Ms. Warfel finally passed some blood. The "physician" assured Ms. Warfel that it was "all done." However, Ms. Warfel continued to suffer from tremendous abdominal pain. Finally, she demanded to have an ultrasound (either in the US or Mexico). Hecht relented and a physician was brought to the house with a portable ultrasound. The ultrasound showed "blood" in her uterus but was otherwise inconclusive. Ms. Warfel and Hecht ultimately made their way back to Aspen, with Ms. Warfel still in excruciating pain. Upon examination by an Aspen physician, it became clear that not only had the Mexican treatment failed to terminate the pregnancy, Ms. Warfel's abdomen was now full of blood.

23.     Upon her return from Mexico on January 13, 2015, Ms. Warfel had to undergo a second chemical termination to complete the one initiated in Mexico a month earlier. Ms. Warfel suffered excessive bleeding, more pain, and the psychological trauma of undergoing a botched abortion. While in Aspen, Ms. Warfel had to go to the Emergency Room as a result of the pain. Had Hecht allowed Ms. Warfel to complete the treatment that she had initiated in the United States, and undergo a proper termination with adequate care, Ms. Warfel would not have had to endure what she did.

24.    By the Spring of 2015, Hecht needed to get drug tested to see his children. When he failed his drug test, Ms. Warfel suggested Hecht go to rehab and that she would go too, having now become addicted as a result of the Mexico painful ordeal. Hecht refused to go and refused for Ms. Warfel to go because he argued there would be other men there and she would be looking for a "partner" or husband.

25.    Six months after the Mexico incident, in June 2015, Ms. Warfel and Hecht bought an apartment in New York together. Hecht kept acting as though the two of them would have a life together. During that same month, Ms. Warfel told Hecht that she was once again experiencing symptoms of pregnancy. Hecht responded they were going to "figure things out" and if she *was* pregnant, it would not be a problem and they would discuss what to do. Once the two of them went back to Aspen, Hecht encouraged Ms. Warfel to take a pregnancy test. He reiterated that if she *was* pregnant, they could have the baby if that was what Ms. Warfel wanted. However, everything changed when Ms. Warfel's pregnancy test came back positive. Hecht told Ms. Warfel she would not be having the child. Ms. Warfel started crying because she wanted to have the child and not have another abortion. Given the situation, Ms. Warfel asked Hecht for time to process her feelings.

26.    In the meantime, despite her reservations, Ms. Warfel agreed to go to Los Angeles with Hecht to discuss her options with the physician who had previously treated her and whom she trusted. This was meant to give Ms. Warfel some perspective and determine whether and how she could proceed, or not, with the pregnancy. Hecht was unhappy about the situation and resorted to his usual tactic: dangling the promise of a future together while conditioning it on the termination.

27.    Despite Hecht's promises, while in Los Angeles, Ms. Warfel became adamant that she would not terminate the pregnancy. She called her parents to announce the arrival of a baby

and told her friends that she was going to be a mother. When she told Hecht about her decision, he

lost it. Hecht resorted to cutting Ms. Warfel off financially, threatened to interrupt her cell phone

service, and blocked her credit cards. All the while, he kept telling her she would get him and their

life back if she did "what was right for them," to have an abortion.

28.     On Friday, June 12, 2015, or Saturday, June 13, 2015, Ms. Warfel had an initial

visit with her Los Angeles physician. After her appointment, Ms. Warfel went back to the hotel

and told Hecht that she would not be having the abortion. Hecht lost it again. Ms. Warfel called

her friends for support. Hearing her desperation, recognizing an increasingly unhealthy situation

and Hecht's abuse, on or about Sunday, June 14, 2015, Ms. Warfel's friends came to her hotel

room, took her belongings, and kept Ms. Warfel at a friend's. Ms. Warfel's friends went to collect

her belongings from the room she shared with Hecht without her. At that time, Hecht supposedly

bragged to them that he had caused seven abortions:



Adding insult to injury, based on Ms. Warfel's friends' description of the events Hecht was using

cocaine while in his hotel room. On June 12, 2015, Ms. Warfel sent her ultrasound to Hecht. The

ultrasound reflects the fact that Ms. Warfel had checked in as "Brooke Hecht." This was a result

of Hecht's insistence that Ms. Warfel refer to herself as "Mrs. Hecht," which included issuing

credit cards to Ms. Warfel under the name "Brooke Hecht":

 

29.     The next day, on or about Monday, June 15, 2015, Ms. Warfel had a surgical appointment but instead of going to the surgical center, she called her physician and told her that she wanted to keep the baby. The physician answered that Ms. Warfel's desire to have the child had been evident at their previous appointment and that given her state of mind, she obviously should not go through with the procedure. However, given Hecht's abusive behavior, Ms. Warfel hid this from him. Instead, she told him that her health was so poor and her blood work so unstable that it was medically unsafe for her to proceed. Ex. 1. Hecht's text messages from that day show his pretextual concern for Ms. Warfel's health and his single-minded determination to see the pregnancy end:



At that point, Ms. Warfel partly dropped the excuses and, again, expressed her desire to have the child she was carrying:



In light of Hecht's continued resistance, in an effort to calm him down, she then asked to have some time to process her decision:



Faced with this, Hecht "turned on the charm," promising marriage and renewing his vows of affection. When this failed, Hecht decided it was time to cut and run, creating even more pressure

on Ms. Warfel to terminate the pregnancy. He unexpectedly chartered a plane and flew back to Aspen, leaving Ms. Warfel alone in Los Angeles, with no money, no resources, and no medication—including none of the suboxone she needed to continue her rehabilitation. These tactics were aimed at strong-arming her into making the decision that he wanted.

30.    On Monday evening, alone in Los Angeles, Ms. Warfel checked into a hotel. On Tuesday, June 16, 2015, Ms. Warfel's friends came to visit her but became alarmed at her condition. Ms. Warfel was undergoing serious withdrawals, while pregnant, and without medication. Hecht had taken the one drug that Ms. Warfel needed continue on her road to recovery—the one thing that she relied on to deal with her addiction caused by Hecht's Mexico "doctor":



Ms. Warfel called out Hecht's outrageous behavior for what it was. When Ms. Warfel failed to "back down" regarding this conduct by Hecht, he—a man in his forties with three children of his

own—complained that he was in a "tough spot" and that having a baby was "beyond what [he could] deal with" at that time:

> Received on Jun 15, 2015 8:59:12 PM
> I am in a tough spot and have three kids. You surprising me with the notion that you are having a baby is beyond what I can deal with now. I hope you don't bring a child into this world now

Seeing that he was getting no traction, Hecht changed tactics and resorted to reminding Ms. Warfel of her financial dependence on him.

31.    Hecht chose this moment to remind Ms. Warfel that all her jewelry belonged to him, was internationally registered, and that she would be unable to sell it. He said, "I have certificates to all your watches and jewelry that you cannot sell without. So what are you doing carrying it all around. If you go try to sell a diamond like that without its original certificate you can't sell it and might get arrested." Ms. Warfel, understandably upset, told him to "eat [her] diamonds and wear [her] watches." Faced with this, Hecht finally tried to buy Ms. Warfel, "Send me the jewelry and I'll give you cash . . . ." This, too, didn't work. It did, however, make Ms. Warfel feel abandoned and alone. Hecht again, leveraged her vulnerability by promising love and affection, "We both have versions. We both love each other. We both know we at [sic] destined. We stick. You left Brooke. This is what I mean. Let's focus on what's most important." It is important to remember that Hecht's actions are all taking place while Ms. Warfel was in the hospital.

32.    Ms. Warfel spent the night from Tuesday, June 16, 2015, to Wednesday, June 17, 2015, in the hospital. Her communications with Hecht continued through the night and into the next day. Recognizing Ms. Warfel's increasingly fragile emotional state, Hecht continued the

offensive. He again began pressuring Ms. Warfel to have an abortion, ignoring her messages regarding her physical and emotional pain:



Showing further callous disregard for her well-being, Hecht could only keep repeating one question: "Is it done?"



33.    On June 17, 2015, Ms. Warfel was feeling no better but the hospital could not treat her withdrawal. Having confirmed the baby was healthy, Ms. Warfel checked out of the hospital and went back to a hotel. Throughout that time, Hecht kept asking the same question over and over again:



After three days of continuous pressure, Hecht wore down Ms. Warfel and she agreed to the abortion—although she expressed her heartbreak at the situation:



Hecht reacted with relief and reiterated how *he*—a married man in his forties with three children—was just "unprepared" for fatherhood and that his lack of preparation explained his reaction to Ms. Warfel's pregnancy:



34.     Ms. Warfel and Hecht continued to message each other through June 17, 2015. If

Ms. Warfel expressed any amount of sadness or regret about the abortion or backtracked and

reconsidered the decision altogether, Hecht immediately reminded her that if she failed to have an

abortion, he would leave her and he would make life miserable for her:





35.     After Ms. Warfel made it back to her hotel, her withdrawals were making it harder and harder for her to function. She told Hecht about this. Instead of overnighting her suboxone back to her (as recommended by the medical personnel at the hospital), Hecht had one of his local drug dealers deliver some Percocet to Ms. Warfel. Hecht then used the fact Ms. Warfel took the Percocet to argue that the fetus was likely irreparably damaged and having it would be disastrous. He told her that their child would be mentally impaired because of her drug use and that she would only find out at the 20-week ultrasound. By Thursday, June 18, 2015, Ms. Warfel was alone in Los Angeles and distraught. Her increasing isolation became overwhelming so she broke down and gave in to Hecht.

36.     Ms. Warfel flew back to Hecht on June 18, 2015, and by June 19, 2015, she was in Aspen, ready to chemically terminate the pregnancy. Over the course of June 19, 20, and 21, 2015, Ms. Warfel underwent a chemical abortion while in an Aspen hotel room. While Hecht's fiancée was having an abortion in a hotel room in Aspen, Hecht was also arranging to pay for sex with women from "International Model." Ex. 10. On June 18, 2015, while Hecht was convincing Ms. Warfel to fly back from Los Angeles to Aspen to get an abortion, he was also emailing the International Model Madam, "I'll buzz you in a few. In case you get a 970 number calling ignore it. The crazy one [his pregnant purported fiancée] was poking in my phone." Ex. 10 at 3. The Madam responded, "Oh no! Brooke? Please get rid of her. I can find u hotter girls that are sweet." *Id.* at 3. She then offered to send "Ericka" over for the weekend but Hecht responded, "Tough." *Id.* The response was, "Ok let me know when u get rid of her and I can have some great girls lined up for you." *Id.* Hecht answered, "Deal." Apparently, the two were able to reach an arrangement because subsequent email communications indicate "International Model" sought to collect money

from Hecht to the tune of $7,000 for services rendered. *Id*. at 1–2.[2] Meanwhile, across town, Ms. Warfel—convinced she was engaged to Hecht—was terminating an abortion at Hecht's insistence.

37.     Unfortunately for Ms. Warfel, this termination too was not without complications. After several trips to the hospital, including one in July 2015 as a result of being physically assaulted by Hecht, Ms. Warfel had to return for a dilation and curettage ("D&C") in August 2015. The August 2015 D&C ended the pregnancy. By then, Ms. Warfel had ended her relationship with Hecht but was still living with the consequences of his abuse and manipulation.

### C. Hecht Falsely Imprisoned and Physically Assaulted Ms. Warfel.

38.     Hecht, "verbally attacked, threatened and terrorized" Ms. Warfel during their relationship. Ex. 6. She repeatedly expressed that she was scared of him:





Unfortunately, after his outburst, as usual, Hecht was able to convince Ms. Warfel to stay in the relationship. But this was neither the first nor the last time that Hecht would scare Ms. Warfel. Hecht regularly threatened Ms. Warfel and her family with physical violence, "[Mr.] Hecht threatened to, among other things, kill me and my mother, torment my father, knock my teeth out

---

[2] Leaving nothing up to interpretation, Mr. Hecht also had a "Contact" entry under the name "Hooker" with a local number of a woman. Ex. 11.

and break my legs." Ex. 12 at ¶ 13. Eventually, the threats escalated into action, which precipitated the end of the relationship.

39.     In the Summer of 2015, as explained above, Ms. Warfel was recovering from an abortion that Hecht pressured she get. In July 2015, Ms. Warfel was still having complications from her chemical abortion. Her condition notwithstanding, in mid-July 2015, Hecht took Ms. Warfel to his Woods Lake Cabin. Woods Lake Cabin is an isolated area, approximately 45-60 minutes from the nearest gas station with no cell phone service. Hecht, Ms. Warfel, and his six year-old son spent three nights there together. The last night the two of them were there, Hecht lost his temper at Ms. Warfel. Ms. Warfel started packing her clothes. Hecht became irate. He took Ms. Warfel's clothes and threw them all over the room. Hecht first refused to let Ms. Warfel leave and threatened to punch her in the face. This was the start of what can only be described as one of many "nights of terror." Out of fear of what was going to happen, Ms. Warfel began recording because she was scared for her life. The recording from that night reflects that Hecht then tried to kick Ms. Warfel out into the night for her crying, without letting her take her clothes, her belonging, and without having a way to get very far:

```
2                    NIKOS:  If you're going to cry, get out.
3        Get out.  Honestly (inaudible) a good walk.
4        (Inaudible).
5                    BROOKE:  I don't have anyplace to go.
```

Hecht knew that even if Ms. Warfel left the cabin in her nightshirt, she would be unable to get anywhere unless she had her belongings. Hecht again accused Ms. Warfel of being "disrespectful" and not knowing her place. She tried to explain her reaction by referring to earlier threats he had

made, "Nikos, you said you were going to knock my teeth out and kill my mother." Ex. 8 at 3.

Unrepentant, Hecht answered, "Your mother deserves to die. And your teeth probably deserve to

come out. Okay? Get with it." *Id.* at 3. Hecht then repeatedly tried to kick Ms. Warfel out of the

house and into the night, by herself:

```
12          NIKOS:  Get out, get out, just get out.
13          BROOKE:  No, I'm not going out in the woods
14     by myself.
```

Ex. 8 at 3. In a fit of anger, Hecht also told Ms. Warfel that he was going to get, "a big black

n***er [to] cut off [Ms. Warfel's] ring on [her] finger" and "knock [her] teeth out." Ex. 8 at 4.

Escalating the threats, Hecht then threatened to murder Ms. Warfel's mother:

```
23          NIKOS:  The only thing that (inaudible) is
24     anger about when I fucking murder your bitch-ass
25     mother.
```

Ex. 8 at 8. Hecht also told Ms. Warfel that he wanted to "put a bullet" through her mother's head:

```
9          NIKOS:  Your friends do suck and your
10     mother should be shot for coming up to my house like
11     that.  I would like to shoot her.  If I thought I
12     could get away with it, I would fucking put a bullet
13     in her head.  She's no value to you.
```

Ex. 4. Finally, Ms. Warfel began agreeing with everything he said and apologizing for all perceived

improprieties hoping to calm him down, avoid a physical assault, and gain back her freedom to

leave the cabin with her belongings.

40.     The situation came to a head at the end of July 2015. From July 25 to July 26, 2015,

Hecht subjected Ms. Warfel to a night of abuse and violence that an Aspen judge recently described

as, "a night of terror." Ex. 9. This night of terror was the result of five days of Hecht's non-stop

use of cocaine and synthetic heroin. Ex. 12 at ¶ 10. During that time, Hecht was doing drugs,

"morning, noon and night." *Id.* Hecht has since plead guilty to harassment involving a shove, strike

or kick and including domestic violence. Ex. 9 at 4, 8. The evening began with verbal abuse,

including threats of violence:

```
13            NIKOS:  I will fucking split you, pussy to
14     mouth, before you fucking survive without me.  What,
15     are you fucking kidding me?  Do you really think --
```

Ex. 2 at 3. Hecht then obsessively asked Ms. Warfel about past relationships, "How many guys

have you f****d?" Ex. 2 at 4. Hecht repeated his question at least fourteen times in the span of a

few minutes, while choking Ms. Warfel and preventing her from getting clothes:

```
2            NIKOS:  You're full of it.

3            BROOKE:  (Crying.)

4            NIKOS:  (Inaudible).

5            BROOKE:  Please don't hurt me.

6            NIKOS:  I want to know --

7            BROOKE:  Please don't hurt me.

8            NIKOS:  -- how many guys have you fucked?

9            BROOKE:  Please, you just choked me.

0            NIKOS:  How many guys have you fucked?

1            BROOKE:  Please.

2            NIKOS:  How many guys have you fucked?

3            BROOKE:  Please, please, please.

4            NIKOS:  How many guys have you fucked?  How

5    many guys?  (Inaudible).  How many guys have you

6    fucked?

7            BROOKE:  (Inaudible.)

8            NIKOS:  How many guys have you fucked?  How

9    many guys?

10           BROOKE:  Please, don't hurt -- please don't

11   hurt me.

12           NIKOS:  How many guys?  How many guys?

13           BROOKE:  Please don't hurt me.

14           NIKOS:  I'm just curious.

15           BROOKE:  Please don't hurt me.
```

*Id.* at 4-6. His obsession with shaming her for the number of sexual partners he imagined she had

had before meeting him continued as he *demanded* to know her exact number of former lovers and

what acts she had performed with them:

```
 1              NIKOS:  You (inaudible).  So you could have
 2     fucked 100 guys.
 3              BROOKE:  No, no way.
 4              NIKOS:  Twenty?
 5              BROOKE:  No way.
 6              NIKOS:  Ten.
 7              BROOKE:  No.
 8              NIKOS:  Five?
 9              BROOKE:  Ten, 12 maybe.
10              NIKOS:  And swallowed them all.
11              BROOKE:  No.
12              NIKOS:  Just a few you liked.
13              BROOKE:  No.  Why, Nikos?
14              NIKOS:  Did you have a best?
15              BROOKE:  Please stop.
16              NIKOS:  Did you have one you liked
17     particularly?
18              BROOKE:  Please stop.  You.  I am in love
19     with you.  I want to marry you.
```

Ex. 3. These questions were meant to harass, shame, and belittle Ms. Warfel. When Ms. Warfel

asked to be able to take some clothes with her, Hecht refused and got violent:

```
7            BROOKE:  Please, just let me have some
8    clothes.
9            NIKOS:  You see that (inaudible).
10           BROOKE:  I don't know.
11           NIKOS:  How many guys?  Do you know?
12           BROOKE:  Nikos, stop.
13           NIKOS:  (Inaudible.)
14           BROOKE:  Stop it.  You're being violent.
15           NIKOS:  You're (inaudible).
16           BROOKE:  You're being violent.  Stop.  Just
17    let me --
18           NIKOS:  Or what?  Slow down, slow down.
19           BROOKE:  Just let me have some clothes.
20           NIKOS:  No.
21           BROOKE:  I can't get through to you.  Just
22    let me have my clothes.
23           NIKOS:  You can have some underwear.  The
24    rest (inaudible)
```

Ex. 7. In typical fashion, Hecht reminded Ms. Warfel of his "status" and that her lack of respect made him want to "knock her teeth out":

```
23           NIKOS:  Do you think she's just going to
24    have cops coming up to -- I'd like to knock your
25    fucking teeth out.  You are so irreverent.
```

Ex. 4 at 5. Throughout the exchange, Ms. Warfel expressed how scared she was of Hecht:

```
20          BROOKE:  Nikos, you're not acting normal.

21    You don't want to resolve stuff with me.  You just

22    want to fight with me.  I woke up shaking to death.

23    I'm scared to death.
```

Ex. 5. She specifically told Hecht she was afraid that he was going to lay hands on her at any

moment:

```
20          BROOKE:  Okay.  I'm walking on (inaudible)

21    shells.  I'm scared to death you're going to hit me

22    or you're going to yell at me.
```

Ex. 5. Unfortunately for Ms. Warfel, that is exactly what happened. Although Ms. Warfel was able

to call 911 before Hecht became violent, Hecht answered the 911 return call and lied to law

enforcement about why the call had been made. After that point, it was too late for Ms. Warfel.

Hecht choked her, as described above and "push[ed her] so hard that [she] fell and hit [her] head

on the concrete floor." Ex. 6. Hecht then physically prevented Ms. Warfel from leaving his home

until the next day. *Id*. Once Ms. Warfel was able to leave, she went to a hospital where her injuries

were documented. The Aspen County judge, accepting Hecht's plea, described these two days as

"a night of terror. It was a night of terror that lasted for two days." Ex. 9 at 24. The court also

recognized the pattern of abuse that was evident on that night, as was evident from the remainder

of Hecht's relationship with Ms. Warfel, "I think the obsessive nature of—of the power and control

and the abuse that you exhibited in what I have as the transcript." Ex. 9 at 25.

      41.     During his plea, Hecht had to admit that the events of that night constituted

domestic violence:

| The Court: | An act of domestic violence in the statute is a—is defined as an act or threatened act of violence upon a person with whom you have been involved in an intimate relationship. Would you agree? |
|---|---|
| Hecht: | I agree with that. |
| The Court: | Okay. It also includes any other crime against a person or against property when used as a method of coercion, control, punishment, intimidation or revenge directed against that person with whom you have an intimate relationship. Would you agree that that— |
| Hecht: | I agree with that. |
| The Court: | That is something that you are accountable for. |
| Hecht: | I've given a lot of thought to it and I feel I am. |
| The Court: | Okay. Good. So you're here to be accountable . . . |
| Hecht: | I am . . . |
| The Court: | . . . for your acts of domestic violence . . . |
| Hecht: | I am. |

Hr'g Tr. 10:10-11:6, Ex. 9. In the guilty plea that Hecht signed, he admitted to even more specific allegations, "I acknowledge that the underlying factual basis of this crime has been found by the court on the record to include an act of Domestic Violence, as defined in C.R.S. 18-6-800.3(a). . . ." Ex. 13. Hecht also admitted to the definition of domestic violence:

> 'Domestic Violence' means an act or threatened act of violence upon a person with whom the actor is or has been involved in an intimate relationship. Domestic violence also includes any other crime against a person or crime against property or any municipal ordinance violation against a person or against property, when used as a method of coercion, control, punishment, intimidation, or revenge directed against a person with whom the actor is or has been involved in an intimate relationship.

Ex. 13.

42.     After the assault, Hecht texted Ms. Warfel 109 times in the span of a few hours and made approximately 113 calls to Ms. Warfel in an attempt to get her to recant her story. During those communications he also threatened Ms. Warfel and told her that his lawyer would make "mincemeat" of her if she tried to go to law enforcement:



Hecht also told Ms. Warfel to tell the police that the choking was just "kinky" stuff. On July 27, 2015, at 12:34 pm—after Ms. Warfel was finally able to leave Hecht's home—he texted her:



Hecht's persistent and numerous messages were laced with pleas for Ms. Warfel to come back, half apologies, finger-pointing, and declarations of love:



Hecht went so far as to accuse Ms. Warfel of choking and beating herself up:

When Ms. Warfel informed Hecht she was talking to the police, he reminded her that he had three kids and he could get a "mandatory 10-year sentence":



Ms. Warfel, as is typical with victims of domestic violence, initially defended and protected Hecht:

However, what Ms. Warfel would *not* do is return to Hecht's home or call him. And in Hecht's controlling universe, this was unacceptable. His text messages turned from adoring and pleading to condemning. As was his habit, and as described above, he accused Ms. Warfel of being "self righteous" and "high and mighty." He also took issue with the fact that Ms. Warfel would not bring him the engagement ring for a photo shoot, which he was supposedly trying to set up right around the time he subjected her to the above-described "night of terror":



Received from **NH** on Jul 27, 2015 11:54:56 AM
You really have gotten yourself totally u grateful and forgetful. You're blaming like you're bred to do. I feared this. That whole note. I'm ready today. I was this am and tmrw. You won't answer my calls or come over. Is it over?  If you came back we could have worked it out. If I were to give my side your jaw would drop because it's totally opposite of yours. Not one agreement a d I'm certain. Anyway I want to marry you. Do you want to? I've see. You get Ritoous and high and mighty five times now. I love you. I wouldn't say any of what you did. My view is so different. I don't agree with you and am more certain about my view than anything in my entire life. I've asked my mom dad and they are appalled. Neverthess they love to as I do. I want to spend the rest of my life with you. But. I will ever not know truth nothing like you see it. I sure would to explain because the lightbulb is very bright and I'm certain. However nothing matters more than you. I thought you would never place blame and point fingers of he life things. Nobody makes it like that. I tested you ready to go and had a wing a the Louie closed down to propose. You don't dark your husband or take your things 30 times. This time you think it's ok but I think it should be once. Taking your things is taking money. Hiding my car. Everyone set it was just money. But o know you. I will never stop betting and loving on ykjn

Mr. Warfel responded to Hecht, "You know why I won't call you or come to the house because I am SCARED." Hecht upped the ante, promising Ms. Warfel that someone had just offered to marry them on a yacht in St. Tropez, and trying to convince her to call him to discuss this:



Received from **NH** on Jul 27, 2015 1:29:55 PM
Someone just offered to marry us on a yacht off at tropez next Friday.

Received from **NH** on Jul 27, 2015 1:36:37 PM
They are calling some people now for you in case this goes. Hope it doesn't.  No pressure at all

Received from **NH** on Jul 27, 2015 1:37:20 PM
If you call I can explain.

Hecht also asked Ms. Warfel to tell the police that the choking was just part of sex play:



Received from **NH** on Jul 27, 2015 9:05:20 PM
Did you tell them that the choking thing was goofy kinky stuff?

Received from **NH** on Jul 27, 2015 9:05:20 PM
If asked you will admit right?  Hanks so much. For this.  Will you talk to Joe

"Joe" in the exchange above is Sheriff Joe DiSalvo. As described further down, Hecht did manage to convince Ms. Warfel to go "talk to Joe" in an effort to halt his arrest. But by July 28, 2015,

thankfully, the wheels of justice were in motion and Hecht's lawyer, Pamela Mackey, was reaching

out to Ms. Warfel:

Received from +13038886111 on Jul 26, 2015 10:23:12 AM
**Dear Brooke. This is Nikkos's lawyer. If you are willing, I would like to speak with you.**

**You can reach me on my cell phone: 303-888-6111**

**Thank you**
**Pamela Mackey**

That same day Mackey contacted Ms. Warfel and the two spoke by phone. Ms. Warfel was in

tears, still bleeding from her incomplete abortion, and dealing with the trauma of Hecht's abuse

and ongoing harassment. Mackey immediately got down to business and asked Ms. Warfel, "what

she wanted?" implying that Ms. Warfel either had ulterior motives or could be bought. Ms. Warfel,

confused about the events, responded she didn't want anything and that Hecht needed help. The

conversation ended.

43.     On the day Hecht was arrested, Mackey again contacted Ms. Warfel. She demanded

that Ms. Warfel return keys to two cars that belonged to Ms. Warfel and/or were rightly in Ms.

Warfel's possession. On that same day, Ms. Warfel got a call from her therapist informing her that

AmEx was disputing a charge to the credit card she had used. Hecht had had that card issued under

the name of "Brooke Hecht," and he was the only person who could call in such a dispute. In fact,

Hecht shut down all of the cards that he had previously had issued in Brooke Hecht's name. He

also disputed any and all charges made by Ms. Warfel on his credit cards.

44.     After the assault, Ms. Warfel was able to obtain a Mandatory Protective Order (the

"MPO") as a result of the events of that night. Hecht then violated the Protective Order by trying

to contact Ms. Warfel three times. Hecht, in fact, sought to contact Ms. Warfel on a new phone

number that she had only shared with a few people, which was unlisted, and which she never

shared with Hecht. This violation of the MPO was harassment and intended to cause Ms. Warfel emotional distress.

45. This constituted some of the abuse and violence Hecht put Ms. Warfel through. Ms. Warfel brings this lawsuit to finally hold Hecht accountable.

## C. CLAIMS FOR RELIEF

### 1. First Cause of Action: Assault

46. The foregoing paragraphs are incorporated herein by reference.

47. Hecht committed assault against Ms. Warfel on multiple occasions:

    a. He repeatedly threatened Ms. Warfel to the effect that he was going to "knock her teeth out";

    b. He threatened Ms. Warfel to the effect that he was going to hire someone to cut her finger off;

48. These threats were assault because:

    a. Hecht acted either with the intent of making contact with Ms. Warfel or with the intent of putting her in apprehension of such a contact;

    b. Ms. Warfel was placed in apprehension of an imminent contact with Hecht as a result of Hecht's words;

    c. Such contact was or appeared to be harmful and/or offensive.

### 2. Second Cause of Action: Battery

49. The foregoing paragraphs are incorporated herein by reference.

50. Hecht committed battery against Ms. Warfel twice. During the night of July 25-26, 2015, he: 1) choked Ms. Warfel; and 2) grabbed her such that he bruised her arm and her head hit the concrete floor.

5.  These acts were battery because:

   a.  Hecht acted either with the intent of making contact with Ms. Warfel or with the intent of putting her in apprehension of such a contact;

   b.  Ms. Warfel was placed in apprehension of an imminent contact with Hecht as a result of Hecht's words;

   c.  Such contact took place; and

   d.  Such contact was offensive and/or harmful.

### 3. Third Cause of Action: Intentional Infliction of Emotional Distress

51.  The foregoing paragraphs are incorporated herein by reference.

52.  Hecht intentionally inflicted emotional distress on Ms. Warfel via outrageous conduct. The conduct is described above and includes, but is not limited to:

   a.  controlling Ms. Warfel's communications and movements with baseless threats of police intervention;

   b.  coercing and emotionally manipulating Ms. Warfel to terminate multiple pregnancies;

   c.  abandoning Ms. Warfel while she was reconsidering terminating her pregnancy in June 2015;

   d.  repeatedly threatening Ms. Warfel's family, especially her mother, with physical violence;

   e.  repeatedly threatening Ms. Warfel with physical violence;

   f.  forbidding Ms. Warfel from talking to her family, friends, and therapist about the abuse she was undergoing at his hands;

   g.  threatening Ms. Warfel so that she would lie to the police about her assault;

    h.   harassing Ms. Warfel by phone (by making 113 phone calls and sending 109 text messages in less than 24 hours to prevent Ms. Warfel from accurately reporting his actions to the police);

    i.    coercing Ms. Warfel into falsely filling in a victim statement; and

    j.    continuing to harass Ms. Warfel despite the existence of an MPO.

53.    Hecht's actions constitute outrageous conduct because:

    a.   Hecht engaged in extreme and outrageous conduct;

    b.   Hecht engaged in such conduct recklessly or with the intent of causing Ms. Warfel severe emotional distress; and

    c.   Hecht's conduct caused Ms. Warfel to suffer severe emotional distress.

**4.  Fourth Cause of Action: False Imprisonment**

54.    The foregoing paragraphs are incorporated herein by reference.

55.    Hecht falsely imprisoned Ms. Warfel when: 1) he took her to the isolated Woods Lake Cabin and refused to let her leave; and 2) he refused to let her leave his home in July 2015.

    a.   Hecht intended to restrict Ms. Warfel's freedom of movement;

    b.   Ms. Warfel's freedom of movement was restricted for a period of time, however short, either directly or indirectly by an act of Hecht; and

    c.   Ms. Warfel was aware that her freedom of movement was restricted.

**5.  Fifth Cause of Action: Negligent Infliction of Emotional Distress**

56.    The foregoing paragraphs are incorporated herein by reference.

57.    Hecht is liable for negligent infliction of emotional distress because:

    a.   Hecht had a duty of care towards Ms. Warfel;

b. Hecht's breach of that duty, his negligence, created an unreasonable risk of physical harm and caused Ms. Warfel to be put in fear for her own safety;

c. Ms. Warfel also suffered physical injury or was in the "zone of danger," notably when he made unwanted physical contact with Ms. Warfel (on multiple occasions) and subjected her to unsafe medical procedures, as well as other acts described above;

d. Ms. Warfel's fear had physical consequences or resulted in long-continued emotional disturbance; and

e. Ms. Warfel's fear was the cause of the damages sought.

**6. Sixth Cause of Action: Negligence**

58.     Hecht is liable for negligence towards Ms. Warfel in that:

a. Hecht had a general duty of care towards Ms. Warfel;

b. Hecht breached that duty towards Ms. Warfel by, among other things, subjecting her to the care of an unqualified individual Hecht held out as a physician, violating her physical and emotional boundaries, engaging in "crazy making," and other acts described above;

c. Hecht's breach of that duty resulted in injury to Ms. Warfel;

d. Hecht's breach of that duty was a proximate cause of Ms. Warfel's injuries; and

e. Ms. Warfel suffered physical, emotional, and psychological injuries.

**V.     PRAYER FOR RELIEF**

59.     WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

a. For general actual, compensatory and special damages in an amount according to proof at trial, with pre and post judgment interest thereon,

b. For attorneys' fees,

c. For costs and expenses,

d. For treble damages,

e. For exemplary damages, in light of the above-described circumstances of fraud, malice, insult, and/or a wanton and reckless disregard of Ms. Warfel's rights and feelings by Hecht, and

f. For such other and further relief as the Court deems just and proper.

## VI.   DEMAND FOR JURY TRIAL

60.   Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 23, 2016

Respectfully submitted,

By */s/ Maria-Vittoria G. Carminati*
Jennifer G. Altman, Esq.
Markenzy Lapointe, Esq.
BOIES, SCHILLER & FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Tel: (305) 539-8400
Fax: (305) 539-1307
jaltman@bsfllp.com
mlapointe@bsfllp.com

David A. Bovino, #40730
BOVINO & ASSOCIATES
600 East Hopkins Ave., Ste. 301
Aspen, CO 81611
Phone: (970) 925-4445
Fax: (970) 925-5333
david@bovinolaw.com

Maria-Vittoria G. Carminati
BOVINO & ASSOCIATES
337 Garden Oaks Blvd., No. 67701
Houston, TX 77018
Phone: (281) 826-9552

Fax: (281) 929-0802
giugi@bovinolaw.com